1825.

Thompson
vs
M'Kim

⎯⎯⎯⎯⎯⎯⎯

JUNE.          THOMPSON *vs.* M'KIM, *et. al.*

An appeal does not lie from a mere practical order of the court of chancery, which is only preparatory to a final hearing, and by which the rights of the parties are not affected.

APPEAL from the court of chancery. The object of the bill in this case, which was filed by the appellees against

A decretal order, passed upon the issue in the cause in relation to the subject matter in controversy, and which settles the right between the parties, may be appealed from.

Whether an appeal lies in any particular case, is a question to be decided by the appellate court alone.

Where the bill states that the defendant received the money in dispute for the use of the complainants, from the debtor of the complainants, under a contract between said debtor and the defendant, and the defendant in his answer, admits the contract, but denies that the construction of it is, that he was to hold the amount received under it for the complainants, but asserts that it was so received for his own use, and the chancellor decides that issue against the defendant, and passes an order directing him to bring the money into court, he may appeal from that order.

A writ of error is mandatory, and leaves nothing to the discretion of the subordinate tribunal.

Appeals in this state are on the same footing with writs of error, and are equally mandatory upon the court from whose judgments or decrees they are taken.

Under the act of 1713, *ch* 4, parties are entitled to an appeal as a matter of right. Under that act an appeal is properly before the appellate court, where it has been demanded in the way provided for by such act, and a transcript of the record of the proceedings of the inferior court, under the seal of the clerk of such court, is filed in the appellate court. The provisions of the act of 1713, *ch.* 4, so far as relates to the manner of prosecuting appeals, have been extended to appeals from chancery by the act of 1729, *ch.* 3

Appeals from the court of chancery in *England*, to the House of Lords, are had without consulting the chancellor. The 2d *sect.* of the act of 1713, *ch* 4, does not apply to appeals from chancery.

The court of chancery of this state is governed by the principles of the *English* court of chancery, so far as the same are applicable.

An appeal from the court of chancery in this state does not, *per se,* suspend proceedings on the decree appealed from.

Pending such an appeal the chancellor, if applied to for that purpose, may order the proceedings to be suspended on such terms as the peculiar circumstances of the case may be found to require, or a special order to the same effect may be passed by the appellate court

The power of so pending the proceedings in chancery in *England,* pending an appeal, by the House of Lords, is not an arbitrarily assumed power, but incidental to that body as an appellate tribunal. The same power, in regard to decrees in chancery in this state, pending an appeal to the court of appeals, is incidental to that court.

The existence of such a power is necessary for the beneficial exercise of appellate jurisdiction.

Where it appears, that if the order or decree appealed from should be reversed by the court of appeals, the enforcement of such order or decree, pending the appeal, would produce irreparable injury to the appellant, an order to suspend proceedings will be passed by that court, on such terms as will not be prejudicial to the appellees.

Under the particular circumstances of this case such an order passed.

Form of the order.

the appellant and *John Bell*, in the court of chancery, on the 22d of September 1812, was, among other things, to recover from the appellant the sum of £40,000, which the bill alleged had been deposited by one *Marcus Heyland* in the hands of the appellant, to and for the use and benefit of the appellees. The material facts stated in the bill are, that *Heyland*, in the year 1810, having purchased a large quantity of dry goods in *England*, amounting to about £67,000, drew several bills of exchange in favour of the persons of whom the goods were purchased, on the house of *William & John Bell, & Co.* of *London.* The bills were regularly accepted. Before they became due, *William Bell*, one of the house of *William & John Bell, & Co.* died, in consequence of which the affairs of the house became deranged, and the aforesaid bills were not paid at maturity. At the instance of *John Bell*, (the other defendant,) and one of the firm, and residing at that time in the *United States*, *Heyland* placed in the appellant's hands about $10,000, for the purpose of securing the payment of the said bills, or if the same should be paid by the house of *W. & J. Bell & Co.* to indemnify them for such payment, they having accepted the bills for the accommodation of *Heyland*. *W. & J. Bell & Co.* afterwards became insolvent, the bills remaining unpaid in the hands of the complainants. The deposit in the appellant's hands by *Heyland*, was made under a contract between himself and the appellant. It is unnecessary, however, to set out this contract here, as it is sufficiently stated both in the chancellor's opinion, and in the opinion of this court. There was a subsequent contract between the same parties, which also appears sufficiently in those opinions. The answer of the appellant admits these contracts, and the deposit in his hands under them, by *Heyland*. It avers also, that before and at the time of the said deposit, the house of *W. & J. Bell & Co.* were indebted to the appellant in a large amount on account of protested bills of exchange, drawn by their house in the *United States*, on the house in *London*, and endorsed by the appellant, and for other bills endorsed by them to the appellant. It also avers, that the deposit by *Heyland* was made with the sole view of securing the appellant from loss on account of his endorsement, as before stated, of the bills of *W. & J. Bell & Co.* drawn by the house here on the house in *London*. It also

states, that the design and true construction of the second contract between *Heyland* and the appellant, which is before referred to, was that *Heyland* should only be indemnified to the amount of the difference between the said deposit, and the debt that might be due from *Heyland* to *W. & J. Bell & Co.* on account of the bills drawn by him, as already stated, on that house, and that it was not intended by this last contract to cancel the first one between the appellant and *Heyland.* The answer further states, that *W. & J. Bell & Co.* on the 8th of May 1811, had actually paid, on account of *Heyland's* bills on them, the sum of £511 4 10 st'g. That they afterwards paid a further sum on the same account, and that the holders of the bills were now engaged in collecting, from the surviving partner of the house of *W. & J. Bell & Co.* other and further sums, and that the appellant had reason to believe that they will collect a large amount. It is unnecessary to notice the answer of *John Bell,* the other defendant. At December term 1822, an application was made by the complainants for an order on the appellant to bring the amount deposited with him by *Heyland* into court, to be distributed amongst the several persons entitled. On this application the chancellor, at the same term, passed the order prayed for, unless cause to the contrary was shown on or before the 15th of the ensuing January. At March term 1823, an order was passed authorising depositions to be taken by either of the parties, before a magistrate, to be used at the hearing of the order for bringing in the money. Under this order several depositions were taken, and a variety of original letters from the appellant to *John Bell,* and from him to the appellant, were proved. This evidence sufficiently appears in the opinions of the chancellor, and of this court. At December term 1824, the appellant applied by petition for leave to amend his answer.

BLAND, Chancellor, at the same term, passed the following order: The arguments of counsel on this petition to obtain an order commanding *Hugh Thompson* to bring a certain sum of money into court, have been heard and duly weighed, and the proceedings in the cause have been attentively read and considered.

This practice of ordering money to be brought into court, is one of very late origin. Lord *Eldon* is reported to have said in 1804, "I remember, when the practice was

introduced of making a defendant pay in money, appearing, by his answer or examination, to be in his hands." But it seems to have been attended with so many beneficial consequences, to have been so often resorted to, and so many of the cases have been reported, that the principles of the rule, by which the court is now governed, may be considered as fairly and fully developed. In the investigation of the principles applicable to this petition, or motion, as indeed in relation to every other legal inquiry, we should perpetually bear in mind, that it is the *reason* and *spirit* of cases make law; not the *letter* of particular precedents.

1825.

Thompson
vs
M'Kim

It is held to be a fundamental axiom, that the judgment of a court must be the conclusion of law arising from the facts presented to it. And in the application of this maxim, there is nothing peculiar in the character of the court, or in the mode of judicial proceeding, by which it can be at all affected or varied. It is a fundamental principle applicable to all courts, and from which none are allowed to depart. The judgment of a court of law is the legal result of the facts admitted by the parties, or found by the jury; and so too, the decree of a court of chancery is the result, according to principles of equity, arising from the facts found in the bill, answer, proceedings and proofs. Such is the acknowledged foundation of all final and general judgments or decrees. But interlocutory orders and decrees, affecting rights, must, so far as they go, have a similar basis; because, no court of judicature can arbitrarily make a *partial* any more than a *total* disposition of the rights of things or persons, without such a foundation. The judge can go no farther than to apply the rule to the case, or to pronounce the law upon the facts, either partially or wholly. It is of the very nature of judicial power to be so limited. It is, however, of no importance, as regards this principle, how the facts are made to appear, or in what shape they are presented to the tribunal; whether by confession; by arithmetical calculation; by necessary deduction; or by positive and direct proof. It is enough if the facts are so placed before the tribunal as to preclude all further denial of them. The court may then be called on, in cases like this, to pass an order, or, in other words, to pronounce the equity resulting from the facts. Such are the elementary principles. Let us now bring them near to the case under consideration.

In cases of this sort it is not necessary, that the party moving for the order should show an unquestionable right to a part or to the whole of the money proposed to be called in. It is enough, that he shows an interest in the safety and final disposition of the funds. The general rule is, that the plaintiff is solely entitled to the fund, or has acquired in the whole of it such an interest, together with others, as entitles him in his own behalf, and the behalf of those others, to have the fund secured in court.

A motion, by a party interested, to order money to be brought into court, can only be predicated upon the allegation, that the clear conclusion of law from the facts is, that the person proposed to be called on has no right or title whatever to hold the money of which he has the possession; and, therefore, the first inquiry is, are there any facts then to be found in the cause warranting such a conclusion? And next, if there are, can the party be allowed at any future stage of the proceedings, to contradict or explain them away? It is not necessary to show, that the person called on is a mere naked trustee, without any legal control over the fund; it is sufficient, if it appears that he has no equitable right or title to the money he is called upon to produce. As, where an executor admitted a balance in his hands, but alleged that an action at law was then depending against him, and insisted, that the fund should not be taken out of his hands while he so remained liable to be called on—But the court ordered in the whole balance; and, on a recovery being had, the money was ordered to be paid the plaintiff in the action, and not to the executor.

It is said in the books, that orders of this kind were originally confined to cases where the facts were expressly admitted in the defendant's answer. It is easy to imagine, that their propriety was originally suggested by cases of that obvious and unequivocal character; but the court, having been made acquainted with their beneficial consequences, soon perceived the principle on which they were based; and in a short time threw aside the anomalous and technical notions about the necessity of finding the facts expressly admitted in the answer.

In the case of *Freeman* and *Fairlie*, which was so cogently pressed upon the attention of the court by both parties, Lord *Eldon* says, "I think it right to say, that *under all circumstances*, I can take the personal estate to have been in 1791, £2000, and that I may add the accu-

mulations to 1812; *but I have not in this answer any distinct admission* that he has laid out the money in East India securities, in such a way as to enable me to ascertain and order him to bring in what is the fair amount of the personal estate." And in conclusion, the chancellor ordered the defendant to bring in the sum of £3680; whence it is clear, that he felt himself at liberty to go as far with his order, or in pronouncing the conclusion of law from the facts in the case, as those facts were then, and in that stage of the case established, and open to no contradiction or explanation in the course of the subsequent proceedings. For, although the chancellor took much pains to show that the defendant had, by his own answer, covered himself with shame, yet the order went no further than the incontrovertible facts in the case would fairly warrant, or, as the chancellor says, "under all circumstances." Hence, if the statements, allegations, and then situation of the cause, in relation to the motion, are of such a nature as to leave the matter open to be affected by the proofs to be adduced at the final hearing, the court cannot pass any interlocutory order or decree whatever on the subject.

But in this case of *Freeman* and *Fairlie,* the facts appear to have been deduced, under all circumstances, from the answer itself. The first step taken to find facts beyond, but in the immediate precincts of the answer was, when a schedule was referred to in the answer as containing a correct statement; the items of which schedule, if added up, would show the sum admitted to be due. Such a form of admission was, therefore, held to establish the facts as unequivocally as if the sum had been distinctly specified in the answer itself. This position necessarily comprehended another case going apparently one step farther, but which was in fact precisely the same in principle; that is, where the party referred in his answer to, and produced, a set of books of accounts, and alleged that they contained a fair, true statement of facts—if on referring them to the auditor, he reports, that they show a certain amount to be in the defendant's hands, it will be considered as an indirect, but sufficient admission of such fact, and the court will order the money to be brought in. But if no distinct fact can be deduced from the answer itself, laying a foundation for such a motion, and the case

is referred to the auditor, and the party, on his examination there, makes admissions of such facts, they will be considered as binding and conclusive as if made in the answer itself. So much then for the direct and indirect statements and admissions of the party himself.

There are other cases which show that the court has gone much further with the principle, and distinctly manifested a disposition to follow it out, in all its bearings. For where a controverted case of account had been referred to the auditor to adjust, and the parties had there fully contested the matter, and the report of the auditor showed a balance in the defendant's hands to which he was not entitled—in such case, after the lapse of the time allowed to except to it had expired, and after it had been confirmed, an order was granted to have the money brought into court, and this not on the ground of any *admission* of the party, for the truth might have been, that he contested every item and every point before the auditor, but upon the ground that the court was presented with facts in that stage of the cause which had been established in a due course of judicial proceeding, which could not thereafter be, in any manner, questioned or denied by the same party.

The objects and inducements for making an interlocutory order, or partial decision of this kind, are to remove the fund out of danger, to place it in a state of the greatest security for the benefit of all concerned; and by circumscribing the field of controversy, to accelerate the further progress of the cause, and save costs; since it is evident, the parties will spin it out while they have the advantage of keeping the money.

Hence it appears, that those who make this motion must show, that they have an *interest* in the money proposed to be called in; and that he who holds it in his possession has no equitable right or title to it whatever. And the facts, on which these positions are to be based, must be found in the cause as it now stands, either admitted or so established as to be open to no further controversy at any subsequent stage of the proceedings.

These principles being settled, the next inquiry is, how far the court may allow itself to range through this case in search of those facts, which are to be thus taken as admitted or established? The plaintiffs contend, that the an-

swer of a co-defendant, and certain exhibits and proofs, taken in express reference to this motion, should be read and considered. On the other hand the defendant, *Thompson*, urges, that the very satisfactory explanations of what he calls his supplemental answer, or at least that matter stated in his petition, filed on the 31st of January last, as the substance of a supplemental answer, which he ought to be permitted now to file, should be taken into view. All these matters must be disposed of before we can safely undertake to bring together what may be considered as the admitted or established facts in this cause in relation to this motion.

The answer of the defendant, *John Bell*, it has been urged, may be resorted to as belonging to the *res gesta*, to the same subject, either as direct evidence, or for explanation, or illustration. It is, in general true, that the answer of one defendant cannot be used as evidence for or against another defendant. Whatever may be the extent of the exceptions to this rule, none of them embrace this case; for it is very clear, that *Thompson* has made no reference to, nor admitted any thing which *John Bell* has said in his answer; nor has the truth of any one of *John Bell's* allegations been put in issue, before the auditor or otherwise, and conclusively established against *Thompson*. The answer of *John Bell*, the co-defendant, cannot, therefore, be allowed to furnish any of those facts on which the decision of the court must be founded on this motion.

The plaintiffs have also directed the attention of the court to the exhibits and proofs taken under the order of the 10th of May last, in reference to this motion, and have contended, that, in cases like this, proofs of collateral facts and circumstances may be introduced. But the authorities relied on to sustain this position, point to an important distinction in the classification of cases of this nature. In cases between vendors and purchasers of real estate, the purchaser who is not in possession cannot be called upon to pay in the purchase money until the title is completed; nor will the mere fact of his taking possession entitle the vendor to call upon him for the payment of the purchase money into court. But if the purchaser, being in possession, exercises acts of ownership, he may be compelled to pay the purchase money into court; and the taking possession, and the acts of ownership, though not mentioned

in the bill or answer, are the collateral facts which may be shown by affidavits, or by proofs taken in a manner similar to those offered upon the present occasion; but in such cases, that the purchase money is due, and the amount, are facts admitted and established; and whether it should be immediately brought in, or whether the purchaser should be indulged until final hearing, or how much short of that, are questions which depend upon equitable circumstances not necessarily involved in the principal controversy, that never would be brought into view, but by such a motion. They are, therefore, truly and properly collateral circumstances. But in this case the question is, whether, in the *direct* progress of a case, it has been established or admitted that a party holding money has no title to it, and is therefore liable to be called on in this way. In this class of cases, it is part of the principal matter in controversy; one of the circumstances of it; as much so as, in the other class, between vendor and purchaser, whether the purchase money was really due or not; and, being necessarily involved in the main question, the court will not stop or delay the regular progress of the cause to investigate or establish it by affidavits or proofs taken out of the regular order. The proof of possession, and acts of ownership, lay the foundation of that equity which entitles the vendor to make the call for his money sooner than he otherwise could do; and, in that class of cases, it is said to be now quite decided, that upon motions of this sort affidavits of such collateral circumstances may be read, and that it was a practice to be encouraged, as it shortened pleading. But there is an obvious distinction between such collateral circumstances and peculiar equity, and the admission or establishment of facts, which go to show the real title to the fund proposed to be called in. Therefore, the proofs and exhibits that have been taken under the order of the 10th of May last, must, upon the present occasion, be laid aside as altogether inadmissible.

Having thus disposed of the proffered auxiliaries of the plaintiffs, let us now take a review of those tendered by the defendant *Thompson*. He insists that a certain paper he has presented as a supplemental answer ought to be considered as an amended answer, or that he ought now to be permitted to file a supplemental answer as prayed by his petition.

It is well known, that it is with great difficulty permitted to a defendant to make any alteration in his answer, even upon a mistake. And there is no instance of its having been allowed for the purpose of retracting a clear and well understood admission. It should appear due to general justice to permit the issue to be altered. The rule upon this subject is, that the defendant must move to put in a supplemental answer, and accompany the motion with an affidavit, in which he must swear, that when he put in the answer he did not know the circumstances upon which he applies, or any other circumstances upon which he ought to have stated the fact otherwise, or that when he swore to his original answer he meant to swear in the sense which he now desires to be at liberty to swear to.

The paper tendered as an amended answer comes within no part of this rule. It is silent as to the causes which occasioned him to omit mentioning the new matter, therein contained, in his original answer; nor does it, or the affidavit annexed, say any thing of his not knowing of the new circumstances therein disclosed. It, in fact, purports to be a mere additional or amended answer proposed to be put on file with the leave of the court, without any previous affidavit attempting to account for the mistakes or omissions proposed to be corrected or supplied. It must, therefore, be altogether rejected. But this defendant has now filed his petition on oath, in a formal manner, praying for leave to file a supplemental answer. This petition points out, with sufficient certainty, that which the petitioner alleges was a mistake as to the time of receiving the money first spoken of in his answer. But that part of the answer, which is thus designated as erroneous, is too indefinite and obscure to lay the foundation of such an order as this, now asked for by the present motion—It speaks of "considerable payments," without specifying whether they were made in bills, or cash, or what was the amount of all or any of them; nor does that part of the answer make any such reference to any other document by which the uncertainty might be removed. Therefore, as regards the present motion, whether the answer is suffered to remain as it now does, or is corrected, as proposed, is of no kind of importance.

The chancellor deems it unnecessary now to decide, whether a supplemental answer should or should not be

allowed to be filed to correct this alleged mistake in reference to the final hearing; since the subject was not distinctly argued and presented to the court with that view.

The second and third class of errors and corrections, stated and prayed for, are of the same character; and the same observations will apply to both. The defendant admits he knew, at the time he answered, that all right or claim which he could, in any manner, make to the monies received from *Heyland;* could only be derived from the deeds which had been previously made and entered into between him and *Heyland.* He does not pretend to have received any money from *Heyland* in any way except under and by virtue of those contracts; consequently, his right to hold and apply it, can only be derived from them. His answer distinctly enough states what he believed to be his rights, as well with regard to the then state of things, so far as they were known to him, as with reference to all other and future occurrences. If these contracts authorised *Thompson* to hold the fund, in any way, for his own use, the original answer, in which he has, by explicit reference, embodied those contracts, as a part of it, with suitable and apt words for that purpose, contains all that is substantially necessary for his defence, and, consequently, those after extensions of *Thompson's* liability, and subsequent ascertainment of the amount of his claim upon the bills, spoken of in his petition, are more proper and fit subjects for proof and adjustment on the final hearing, than of a supplemental answer.—A supplemental answer is only intended to correct the allegations of the original answer, or to remove from it dangerous admissions, so as to let in proof on the hearing of the real merits of the case. In this case all the merits are, on this motion at least, to be derived from the contracts; and the answer covers the whole ground over which those contracts can in any way be extended; consequently, it is in all respects co-extensive with all the real merits of the case in every shape whatever; and, therefore, the supplemental answer prayed for cannot be allowed.

While we are in the way of removing or rejecting matters entirely extraneous from the question now under consideration, it may be well to observe, that, although the letter of the 10th November from *John Bell* to *Heyland,* may be used between the *Bells* and *Thompson,* and shows the

1825.

Thompson
vs
M'Kim

inducement for entering into the two deeds between *Hey-land* and *Thompson*; yet, as it cannot be allowed to control or contradict those deeds, it must, upon the present occasion, be entirely laid aside.

Having removed from about this motion all matters which do not properly belong to it, let us now see how the case stands in its simple and reduced form. It is this—The trustees for all the creditors of *Marcus Heyland*, appointed under the insolvent laws of this state, together with sundry of his specified creditors, now move the court to order *Hugh Thompson*, a defendant, to bring into court the sum of eight thousand eight hundred and eighty-nine pounds five shillings and four pence, sterling money of *England*, which he had received at various times between the 5th March 1811 and the 13th of September following, as specified in the exhibit E referred to in their bill. Which sum of money, they charge, was received under and by virtue of the last mentioned of the two deeds entered into between *Heyland* and *Thompson*, the one dated on the 20th of November 1810, and the other bearing date on the 8th of January 1811. To this *Thompson* answers and admits, that the persons named in the bill are the creditors of *Heyland* as stated, and that the two deeds were made and entered into as stated; but he denies that the second was intended to cancel or supersede the first; and, after making sundry allegations about the true intent, and the proper interpretation of those contracts, and his right to hold and apply the money received under them, to his own use, he then makes a direct answer to the bill as to the money which it alleges to have been received by him as stated in the exhibit E, in these words: "Defendant did receive from *Marcus Heyland* the sums of money mentioned in complainant's bill." And further, "That at the time the money was paid into his hands by *Heyland*, defendant did not expect it would be appropriated to the payment of *Heyland's* creditors in England."

The true construction of written contracts is a matter which belongs exclusively to the chancellor; no parol proof can be admitted to explain them, unless in cases of latent ambiguity. No such ambiguity exists in the present case. Therefore, all the facts relative to *Thompson's* right and title to the money which he acknowledges he has received from *Heyland*, are as fully before the court *now* as they,

1825.

Thompson
vs
M'Kim

can be at any future stage of the cause, or at the final hearing. The only opening for any doubt or hesitation is, as to the true intent and meaning of those deeds: Let us then consider them carefully.

By that of the 20th of November 1810, it appears, *Heyland* had become largely indebted to sundry persons for goods purchased of them; that to secure the payment of those debts, he had drawn bills on the firm of *William & John Bell & Co.* which they had accepted—who might, therefore, if they paid those bills, become the creditors of *Heyland* in place of those of whom he bought the goods. After which the *Bells* transferred and made over this eventual and uncertain claim of theirs upon *Heyland* to *Thompson.* In consideration of which *Heyland* bound himself by this contract to pay to *Thompson* such balance as might be found to be due from him, *Heyland*, to the *Bells*, on account of these transactions, or otherwise, upon the fate of the bills being known, and a fair statement of accounts between *Heyland* and the *Bells.*

This seems to be the clear sense and substance of this first agreement. From which it appears, that *Thompson* was put into the place of the *Bells*; and, consequently, to the extent of their claim upon *Heyland*, became his creditor; and as such, had a right to the funds which were placed in his hands under *that* agreement. But it is doubtful, from the answer, whether *Thompson* ever received any thing or not under this first agreement exclusively; and even supposing he had, the amount not being specified, the court could make no order on this motion respecting it.

It appears however, that the sum specified in the exhibit E, and which is distinctly acknowledged to have been received, came to *Thompson's* hands after the execution of the deed of the 8th of January; and consequently, must be controled and regulated according to that contract, and not the first deed of the 20th of November. Hence it becomes necessary to proceed directly to the consideration of the second agreement dated on the 8th January 1811.

This contract, after a recital nearly word for word the same, and in sense entirely the same as the first, proceeds to declare, that in consideration of the premises *Heyland* is held bound to pay to *Thompson* such balance as might be found due from *Heyland* to the *Bells*, on account of those transactions, or otherwise, up to that time; that *Hey-*

*land* will immediately proceed to account with and pay to *Thompson the amount of the aforesaid acceptances, in the same manner as if it had been ascertained they had been duly paid by the Bells;* that on all those payments *Heyland* was to be allowed the current exchange, and further, that *Thompson should indemnify Heyland to the amount paid into Thompson's hands by Heyland,* against all demands that might be rightfully made against him *on account of those acceptances, either by the Bells, or by the holders of them.*

By this deed *Heyland* does, most clearly and distinctly, give us to understand, that it was his intention to pay all those of his creditors in whose favour he had drawn bills on the *Bells.* For, with what other possible view could he have stipulated to account with *Thompson* for the whole amount of the bills, as if they had been actually paid by the *Bells?* And with what other understanding was the covenant entered into for an indemnity against all those creditors? It is most manifest, therefore, that *Heyland* placed this fund in the hands of *Thompson* for the use of that class of his, *Heyland's* creditors, the bill-holders, whoever they might be.

But it is alleged that *Thompson* has a title to at least a share of this fund as the assignee of the *Bells;* and this, it is said, is proved by the recital in this deed, in which it is acknowledged, that the *Bells* "had transferred and made over all the amount due by the said *Heyland* for the goods which said house of *William and John Bell and Company* accepted to pay on his account to *Hugh Thompson;*" and also by the express stipulation, by which *Heyland* bound himself to *Thompson* for such balance as might be found due from him, *Heyland,* to the *Bells,* on account of those transactions, or otherwise, to the time of executing that deed.

This position may perhaps be more clearly and strongly presented in another form, thus—*Heyland* stands indebted to sundry persons in the sum, suppose for example, of $16000, for the payment of which the *Bells* are his securities, and as such, they have paid for him $4000, and consequently stand in the place of his creditors to that amount. But this claim of the *Bells,* having been assigned by them to *Thompson,* he has thus circuitously become a creditor of *Heyland* to the amount of that $4000, part of the original.

debt of $16000. Now, says the defendant's counsel, *Thompson* must be allowed to return at least one fourth of the fund which has been placed in his hands for the payment of the whole $16000, since he in fact, stands in the place of the original creditors to one fourth of that whole amount.

There is an imposing aspect of equity in this position, and if the court felt itself at liberty to make free with the positive covenants of the parties, there might be no difficulty in applying its equalizing principles to this case, but the court is not at liberty to reject or impair the covenant of indemnity in this deed of the 8th, of January. By that covenant, *Thompson* is bound to save *Heyland* harmless, not merely against the *Bells*, but against all the holders of the acceptances, whoever they may be, to the amount of the funds in his hands. In other words, he is thus constituted a trustee for the bill-holders, of the funds in his hands, to the amount of the balance remaining due and unpaid on those acceptances; for, otherwise *Heyland* would not be indemnified against all demands by the bill-holders, according to the express terms of this contract. The expressions in this deed, "on account of the transactions before alluded to, or otherwise, to the time of executing these presents," were intended merely to refer to the means of ascertaining the extent of *Heyland's* liability to the bill-holders, and the amount of the funds which it was necessary should be placed in *Thompson's* hands to meet those liabilities of *Heyland's*. The great leading object of *Heyland* was to provide for the payment of his *own* debts due to those bill-holders. He had nothing to do with the transactions between *Thompson* and the *Bells*, or with the debts due from the one to the other of *them*. The obvious inducement of *Heyland*, in making this provision in favour of his bill-holders, was some apprehended inability of those who had thus become his security to them. Hence, whatever might have been the nature or design of the assignment of the claim on *Heyland* from the *Bells* to *Thompson*, or of any contract between *those* parties, that transfer, or contract, cannot be permitted to control or contradict the positive and clear stipulations contained in this deed of the 8th of January between *Heyland* and *Thompson*.

In short, the clear and unequivocal objects of this deed, were to place funds in *Thompson's* hands to meet the

claims of those of *Heyland's* creditors, who should present themselves as the holders of his bills, as therein described; and to obtain an indemnity and discharge for *Heyland* from every part of those claims; so far as those funds would go. But *Thompson* does not pretend that he stands here as a creditor of *Heyland* in the special character of a holder of all, or any one of the specified acceptances; he is not, by any thing that is alleged or appears, a holder of any one of the designated bills drawn by *Heyland*. It might be, that *Heyland* looked to other resources to pay the *Bells* any proportion or dividends which they might pay on those acceptances; and this seems plausible. But whatever may have been the intention of the parties, as to any matters not comprehended in the deed, that contract in itself is clear and unequivocal. The fund in *Thompson's* hands was to be applied to the satisfaction of the demands of certain designated bill-holders; *Thompson* is clearly and confessedly not one of them, he has therefore no right or title whatever to the money which *Heyland* had placed in his hands, for his indemnification against them.

It is therefore, on this twelfth day of February, in the year eighteen hundred and twenty-five, Ordered and adjudged, that *Hugh Thompson* bring into this court, on or before the fourteenth day of April next, the sum of thirty-nine thousand five hundred and seven dollars and eighty-five cents, being the value of eight thousand eight hundred and eighty-nine pounds five shillings and four pence, sterling money of *England*, together with legal interest thereon from the first day of January in the year eighteen hundred and twelve, which sum, it appears by the admitted and incontrovertible facts in this cause, he had received from the said *Marcus Heyland*, previous to the fourteenth day of September in the year eighteen hundred and eleven, for the use of said *Heyland's* creditors, as specified in the proceedings in this cause; and which the said *Hugh Thompson* ought, within a reasonable time thereafter, to have paid to the said creditors; Provided a copy of this order be served on the said *Thompson* on or before the twenty-fifth day of the present month. And it is further ordered, that the said sum of money, with interest thereon, when so brought into court, shall be deposited in the *Farmers Bank of Maryland* to the credit of this cause, subject to the further order of this court.

From this order the appellant prayed an appeal to this court, and filed an appeal bond. On the prayer for an appeal, the following order was passed:

BLAND, Chancellor, (2d of May 1825.) In this case the defendant, *Hugh Thompson*, by his counsel, on the 11th of April last, moved the court to grant an appeal from its order of the 12th of February last, and thereupon filed and offered an appeal bond for the approbation of the chancellor. The motion was permitted to lay over until the plaintiffs could be heard; after which their counsel appeared, and asked to be allowed further time to reply, in writing, to the defendant's motion, which was granted; and, on the 28th of the last month, a written argument, on the part of the plaintiffs, in opposition to the motion, was accordingly submitted to the chancellor. The parties having been thus heard, the motion has been deliberately and maturely considered.

The chancellor took some pains, after a very careful research into all the authorities within his reach, to explain the reasons and grounds on which he founded the order of the 12th of February last. The greater part of the debatable ground, occupied in the discussion of the motion for that order, was as to its foundation,—as to the kind of admisions, or state of things which would warrant its being made. The court was, therefore, explicit upon that subject. But, whether such an order was interlocutory, or final—a "decretal order" or not, was neither mentioned in argument, nor considered by the court. The investigation of the nature of the basis of such an order being a matter of much importance, was, however, made with great care; because, upon its being ascertained, whether that basis was solid and uniform, or loose and shifting, depended the very interesting question presented in that argument— whether such orders were likely to be attended with good or ill consequences; or whether they were, or were not capable of being used as instruments of oppression? And it was, on finding, that the authorities required the most broad and solid foundation, *no less clear and strong than that of a final decree itself*, that the court was perfectly convinced of their great utility in all cases where there was a proper foundation for making them, and that they were no more capable of being abused, or applied to improper purposes, than final decrees themselves.

1825.

Thompson
vs
M'Kim

But the foundation, or basis of an order, does not determine its effect upon the controversy or the parties. *An admitted, or incontrovertible state of facts, is required as the foundation of an order to bring money into court. As the foundation of an order to account, it must appear that a computation is necessary relative to the matter on which the court may be called on to decree; and to lay a proper foundation for an order to pay money out of court, the party claiming it must show a clear title in himself. But no inference can be deduted from the nature of the basis of an order as to its true character, that is, whether it be interlocutory or final, a decretal order, or otherwise. Such questions can only be determined by the order itself, considered in all its relations and bearings upon the parties and upon the cause.*

Whether an appeal can be allowed, as moved for, in this case, must depend altogether upon, whether the order of the 12th of February last is or is not a "decretal order," within the true intent and meaning of the act of 1818, ch. 193, s. 1. The *English* authorities explain, with tolerable accuracy, the difference between interlocutory and final decrees in chancery, but the phrase, "decretal order," seems to be variously applied, and to have no settled or distinct meaning or application. The term "order" is almost always used in speaking of those general or special directions by which all suits in chancery are governed, controled, or facilitated throughout, or in the course of their progress from beginning to end; and, the term "decree" is most generally applied to the decisions of the court upon some or all of the rights of the litigating parties. Hence it would seem, that a "decretal order" can only be such an order as finally determines some right between the parties. But we have a satisfactory and conclusive authority of our own state upon this question—The court of appeals, in the case of *Snowden vs. Dorsey,* say, "that an appeal will not lie from a mere interlocutory order by which nothing is finally settled between the parties;" and "which was only preparatory to a final decree, and was liable to be reviewed at pleasure"—or, "where nothing is done conclusive upon the chancellor, but the order remains open, subject to his final disposition, and may be rescinded on motion." Let the order of the 12th of February last be tested by this decision of the court of appeals, and every difficulty must be

at once removed; it is, upon the face of it; merely preparatory to a final decree; nothing is done conclusive upon the chancellor: The order directs, that the money; "when so brought into court; shall be deposited in the *Farmers Bank of Maryland* to the credit of this cause, subject to the further order of this court." The place of the deposit of the money is ordered to be changed. It is to be made more secure for the benefit of all concerned, subject to be disposed of by any future order, or by the final decree; in such proportions and in such manner as the right and title of the parties shall require: This order of the 12th of February last, is not then, according to this opinion of the court of appeals, a "decretal order"—And the construction, thus given by that court; to the phrase "decretal order," in the act of 1818, accords with that which has been always heretofore given to it by this court.

The practice of requiring and giving bond; on an appeal from a decree of the court of chancery, was very carefully inquired into and considered, by the chancellor, in the case of *Ringgold vs. Ringgold;* and, in the course of his investigations in that case, he became perfectly convinced, that there was no legislative enactment of this state relative to appeal bonds from the decrees of the court of chancery. The act of 1729 only declares that the provisions of the act of 1713, on the subject of appeals, so far as they relate *"to the prosecution of them,"* shall apply to chancery cases; and, so far as any thing may be inferred from what was done by the court of appeals in the case of *Smith vs. Dorsey,* at June term 1824, (for the court gave no reasons for their act,) it appears to be the opinion of that tribunal, that there is no act of assembly requiring a bond to be given on an appeal from the court of chancery. But it would be obviously impossible, or very difficult, to apply the provisions of the act of 1713, relative to *appeal bonds*, on appeals from judgments at common law, to appeals from the multiform and complex decrees of the court of chancery. It has, however, been the constant practice to require bond and security on appeals from the court of chancery, where the thing decreed would be put or continued in jeopardy, or at risk. The practice upon this subject, as heretofore settled and established, the chancellor has neither the disposition nor the power to alter in any respect whatever.

But if an appeal would lie from such an order as that of the 12th of February last in this case, and if the chancellor could, in no case, on an appeal, as in *England*, order the money to be paid into court, to remain there pending the appeal, and if he were bound, as has been contended, by positive legislative provisions to grant the appeal, on the parties entering into bond with approved security, then it would be utterly futile to ask for or obtain such an order in any case whatever, even in the plainest and strongest that could be imagined, since the party thus called on could always suspend its execution at pleasure. The order in this case calls on the party to bring the money into court, that the court itself may have it placed in perfect safety for the benefit of all concerned; not that he shall merely give security for the payment of it. But if the party could appeal from such an order, and suspend its execution, by giving an appeal bond, then he could, in effect, prevent the court from going farther than barely demanding security for the payment of the money. The consequence of which would be, that such orders, if made, would operate partially and not alike upon every citizen; upon those most wealthy and best able to comply, they would be mere cobwebs; but upon those least able to find security they would have their full and just effect; they would operate as rigid injunctions. Upon the whole, the chancellor is perfectly satisfied that an appeal cannot be allowed, and therefore,

It is ordered, That the motion of *Hugh Thompson*, to grant an appeal from the order of this court, made on the 12th February last, directing him to bring a certain sum of money into court, as therein set forth, shall be and the same is hereby overruled, and rejected.

At the present term of this court the appellant filed the following petition, together with a duly authenticated transcript of the proceedings of the court of chancery in this case, viz.

To the Honourable the Judges of the Court of Appeals for the Western Shore.

The petition of *Hugh Thompson*, of the city of *Baltimore*, respectfully showeth, that a certain bill of complaint was heretofore exhibited in the court of chancery against your petitioner, and a certain *John Bell*, in which said bill of complaint a certain *John M'Kim*, junior, and *Thomas*

*L. Emory*, junior, &c. are named as complainants; and in which said bill of complaint it is alleged, that a large sum of money, paid by a certain *Marcus Heyland* to your petitioner, must be considered as deposited with him for the use of the above named complainants, excepting from such use the above named *M'Kim* and *Emory;* and in which said bill of complaint it is prayed that your petitioner may be compelled to pay the money, so received by him, to the said *M'Kim* and *Emory,* for the use of the other parties named as complainants in the said bill of complaint. That this petitioner hath answered the said bill of complaint, and in his said answer denied that he received the said sum of money for the use of the aforesaid complainants, or any of them; and also averred that he received the said sum of money, from the said *Heyland*, in payment of a debt due to your petitioner from a certain mercantile house trading under the firm of *William* & *John Bell* & Co. which said denial and averment your petitioner still insists are both true. That certain other and further proceedings were had in the said cause; and pending the said suit, and before the proofs of this defendant were taken, and before the said cause came to final hearing, the honourable the chancellor, by an interlocutory and decretal order, made on the twelfth day of February, in the year eighteen hundred and twenty-five, decided that the said sum of money, paid to your petitioner by the said *Heyland*, was paid for the use of the creditors of the said *Heyland*, and ordered the same to be brought into the court of chancery on the fourteenth day of April last. That your petitioner appealed from the said order to this honourable court, and immediately on making such appeal, filed his appeal bond, with sufficient sureties, in due form of law, and procured a transcript of the full proceedings of the court of chancery, under the hands of the register of the said court, and seal thereof, and also hath caused the same to be transmitted to this honourable court, to be here heard, tried and determined; and also, at the time of making such appeal, your petitioner, by his solicitor, directed and required of the aforesaid register to enter a memorandum of such demand of appeal, as well in his court's proceedings as in the fair records of the proceedings of the court of chancery. That the said appeal was demanded in the manner herein before set forth, and the

said appeal bond filed in the court of chancery before the time limited for the payment of the money into court, by the said order of the honourable the chancellor. All of which will more fully and at large appear by the aforesaid transcript now remaining in this honourable court, to which your petitioner, for greater certainty, prays leave to refer. Your petitioner further states, that after the above mentioned proceedings were had, the honourable the chancellor passed another order, dated May 2d, 1825, in the following words: "It is ordered, that the motion of *Hugh Thompson* to grant an appeal from the order of this *(the chancery)* court, made on the 12th February last, directing him to bring a certain sum of money into court as herein set forth, shall be and the same is hereby overruled and rejected," as by a copy of the said order, contained in the aforesaid transcript, will among other things appear. Your petitioner also states, that as soon as he was apprised of the last mentioned order, he with all convenient speed, to wit, on May 11th, 1825, presented a petition to the honourable the chancellor, praying him to suspend all further proceedings on the aforesaid order of February 12th, until the meeting of this honourable court, and offering in the mean-time, in addition to the personal security before mentioned, to deposit in the court of chancery one hundred thousand dollars of stock of the Bank of the *United States*, now worth in the market an hundred and twenty thousand dollars; and your petitioner, upon such securities, for the ultimate safety of the money in question, besought the chancellor to suspend proceedings on the order first herein mentioned until the meeting of this honourable court, to whom your petitioner is advised it rightfully belongs to ascertain and determine the limits established by law to their jurisdiction in cases of appeal. But the honourable the chancellor rejected the prayer of the said petition, by an order passed on the 12th day of May 1825, as will appear by a copy of the said order herewith filed, marked *A;* and moreover, on the tenth day of May 1825, ordered an attachment against your petitioner, for not complying with the order of February 12, herein before mentioned, and from which said order your petitioner had appealed in the manner herein before set forth; and which said attachment issued accordingly, May 11, 1825, was made returnable before the meeting of this court, that is

to say, forthwith, as by a copy of the said attachment herewith filed marked *B,* will appear. Forasmuch therefore as the honourable chancellor has determined to enforce the aforesaid order of February 12th, by the actual imprisonment of your petitioner, notwithstanding his appeal from the same in the manner herein before stated, and pending his said appeal, and forasmuch as the said appeal and bond, given in the manner herein before stated, operates, as your petitioner is advised, to suspend the jurisdiction of the court of chancery on the matter appealed from, pending the said appeal, by virtue of the act of assembly in such case made and provided; and forasmuch also by the general principles and established usage of the court of chancery of this state, independent of the act of assembly aforesaid, no order or decree ought to be enforced, pending an appeal from such order or decree, and forasmuch also as the principles of equity and justice do not in this case require that the said order should be enforced pending the said appeal, but on the contrary require that the same should be suspended until the final decision of the cause, for the following reasons:

1st. Because the execution of the said order will not, and cannot in any manner benefit the complainants in any event of the cause, inasmuch as the money will remain a dead and unproductive fund in the court of chancery, until the ultimate decision of the case; and inasmuch also, as the money in controversy is already abundantly secured by the appeal bond given by your petitioner, and he is ready and willing, and has offered, and continues to offer, to make it secure in case the ultimate decision shall be against him, by any additional security that may be deemed adequate for that purpose.

2d. Because the execution of the said order would subject your petitioner to needless and ruinous sacrifices on his part, without any possible benefit or advantage to any of the litigating parties; and in the event of an ultimate decision in his favour, will moreover fix upon him an inequitable and certain loss of the interest on the large sum of money mentioned in the aforesaid order, amounting to more than four thousand dollars a year, and for which he can obtain no possible redress.

In tender consideration whereof, and inasmuch also as your petitioner is advised that the said order of February

12th is altogether erroneous, and contrary to the principles and practice of the court of chancery, may it please the court to grant to the petitioner an order, or such other process as they may deem right, to be directed to the honourable *Theodorick Bland*, chancellor, commanding and enjoining him to stay, surcease and suspend, all further proceedings on the said order by him made on the twelfth day of February, in the year eighteen hundred and twenty-five, while the aforesaid appeal is here pending, or until the pleasure of this honourable court shall be known in the premises. And your petitioner, as in duty bound, will pray, and so forth.

Notice of this petition, and of the motion for the order therein mentioned, was given to the counsel of the complainants below, and a day assigned by consent for the argument of the motion, when it was argued before BUCHANAN, Ch. J. EARLE, MARTIN, STEPHEN, and ARCHER, J.

*Steuart, Taney,* and *Wirt,* (Attorney-General of *U. S.)* for the motion, stated, that the questions arising on the petition and motion were,

1. Whether an appeal will lie from the order of the chancellor of December term, 1824?

2. If it will, whether such appeal is not now regularly before this court?

3. And if it is, whether this court have not the power to pass the order on the chancellor, prayed for by the petition, and if the power exists, whether the case does not authorise its exercise?

On the *first* question they referred to 1 *Harr. Chan.* 454. 1 *Wooddison,* 232. 1 *Newl. Chan. Pr.* 68. *The Warden and Minor Canons of St. Pauls vs. Morris,* 9 *Ves.* 316. *Anon.* 1 *Ves. jr.* 92. *Green vs. Winter,* 1 *Johns. Ch. Rep.* 81. *Barrow vs. Rhinelander,* 3 *Ibid* 123. *Snowden et al. vs. Dorsey et al.* 6 *Harr. & Johns.* 114. *Buel vs. Street,* 9 *Johns. Rep.* 443. *Cowper's Plead.* 389. 2 *Madd. Chan.* 290. *Bowen vs. Cross,* 4 *Johns. Chan. Rep.* 377. 1 *Harr. Chan.* 191. *Livery vs. Wilson,* 1 *Ves. & Beames,* 148. *Jennings vs. Merton College,* 8 *Ves.* 79. *Perry vs. Philip,* 10 *Ves.* 33. *Strange vs. Collins,* 2 *Ves. & Beames,* 162. *Warfield vs. Warfield,* 5 *Harr. & Johns.* 459, 467. 3 *Blk. Com.* 56. *Huguenin vs. Baseley,* 15 *Ves.* 184. The acts of assembly of 1713, *ch.* 4; 1715, *ch.* 41; 1721, *ch.* 14;

1825.

Thompson
vs
M'Kim

1729, ch. 3; 1785, ch. 72, s. 27; and 1818, ch. 193. *Green vs. Winter*, 1 *Johns. Chan. Rep.* 81. *Consequa vs. Fanning*, 3 *Johns. Chan. Rep.* 364. *S. C. Ibid*, 590. *Barrow vs. Rinelander, Ibid*, 615. *Smith vs. Smith*, 4 *Johns. Chan. Rep.* 447. *Holmes vs. Remsen, Ibid*, 482. *Snowden vs. Dorsey*, 6 *Harr. & Johns.* 114.

On the *second* point they contended, that if it was a case fit for an appeal, the chancellor had no authority to refuse it. Though the usage is to apply for an appeal in the form of a prayer, yet in all cases where an appeal properly lies, the party is entitled to it *ex debito justitiæ*. This being the case, and the record here having been transmitted in the manner directed by the act of 1713, *ch.* 4, the cause is now properly before this court. They referred to the acts of assembly before stated.

On the *third* question, they contended, that the right to pass the order on the chancellor, prayed for by the petition, was incident to the right to entertain the appeal. They cited *Eden on Injunc.* 229. *Huguenin vs. Baseley*, 15 *Ves.* 184. *The Warden, &c. vs. Morris*, 9 *Ves.* 316. *Gwynn vs. Lethbridge*, 14 *Ves.* 585. *Monkhouse vs. The Corporation of Bedford*, 17 *Ves.* 380. *Way vs. Foy*, 18 *Ves.* 452. *Willan vs. Willan*, 16 *Ves.* 88, 216. *Waldo vs. Caley, Ibid*, 206. *Green et al. vs. Winter*, 1 *Johns. Chan. Rep.* 77. *Messonier vs. Kauman*, 3 *Johns. Chan. Rep.* 66. *Riggs vs. Murray, Ibid*, 160. *Culley vs. Hicklin*, 2 *Bro. Chan. Ca.* 182. *Fox vs. Mackreth*, 3 *Bro. Chan. Ca.* 45, *(& note;)* and *Strange vs. Harris, Ibid*, 365.

*Emory*, and *Winchester*, against the motion. In all cases where a defendant in chancery admits himself to be a mere stakeholder of a fund in controversy, he may be compelled to bring it into court, there to await the final disposition of the case. The design of this proceeding is to secure the persons really interested from the insolvency or dishonesty of such a defendant, and to take from him the temptation of spinning out the controversy. *Gordon vs. Rothley*, 3 *Ves.* 571. *Quarrell vs. Beckford*, 14 *Ves.* 177. *Fox vs. Mackreth*, 3 *Bro. Chan. Ca.* 45. *Blake vs. Blake*, 2 *Sch. & Lef.* 26. *Hatch vs. ———*, 19 *Ves.* 116. *Freeman vs. Fairley*, 3 *Mer.* 29. *Bradshaw vs. Bradshaw*, 2 *Mer.* 492. *Lynn vs. Buck*, 3 *Madd. Chan. Rep.* 280. It is admitted on the other side, that an order of this

scription may be had, where a defendant clearly admits himself to be only a depositary by his answer. In this case the appellant admits the execution of the two contracts, stated in the bill, between himself and *Heyland*; and that he received the amount in dispute in this case under those contracts. If then the true construction of the contracts is, that he was to hold the amount received under them for the use and benefit of the holders of the bills drawn by *Heyland* on *W. & J. Bell*, & Co. he admits himself to be a stakeholder only, as clearly as if he had expressly said so in his answer. They here went into an examination of the contracts. They then stated the questions to be—1. Is this a case in which an appeal lies? 2. If it is, is the appeal properly before the court, and does it, *per se*, suspend the proceedings below? 3. Has this court power to interfere in the manner prayed for?

On the *first* question, they referred to the same acts of assembly referred to by the appellant's counsel, and *Anon.* 1 *Ves. jr.* 93. *Snowden et al. vs. Dorsey et al.* 6 *Harr. & Johns.* 114.

On the *second*, to *Smith vs. Dorsey*, *(ante* 261.)

On the *third*, to *Briscoe et al. vs. Ward*, 1 *Harr. & Johns.* 165. 3 *Blk. Com.* 42, 30. 1 *Wooddison's Lect.* 232. 1 *Blk. Com.* 160; and *Sullivan's Lect.* 413.

BUCHANAN, Ch. J. delivered the opinion of the court. The first question which presents itself for consideration, is whether the order of the chancellor, of the twelfth of February 1825, is of such a character as to form a fit subject of appeal to this court? That an appeal will not properly lie from every order of the court of chancery, such as mere practical orders made in the progress of a cause, or orders preparative of a cause for final hearing, and which do not affect the rights of the litigating parties, is most certain, and appeals of that description will never receive the countenance of this court. If it were otherwise, it would be found difficult, if not impracticable, ever to bring a much controverted suit to issue, at every step in the progress of which it may be necessary to make an order of some kind or other. There is, however, much difficulty in drawing a precise line between such orders as furnish sufficient grounds of appeal, and such as do not, so as effectually to guard against the mischief of occasional

1825.

Thompson
vs
M'Kim

hardship and injustice on the one side, and vexatious delays on the other. No fixed and definite rule can well be established; but every case must, in some measure, depend upon its own peculiar circumstances. In *Snowden's Ex'rs. vs. Dorsey,* decided in this court at the June term 1823, the order appealed from settled nothing in dispute between the parties, it decided no question of right between them, but left the matter in controversy open for future adjudication, and, in the words of the chancellor, was only preparatory to a final decree, the decision therefore was made with a view to the particular features of that order, which bore no impress of the chancellor's judicial opinion upon the merits of the case, consequently the party was in no way aggrieved, and there was nothing for the authority of an appellate court to act upon.

But where there is a decretal order passed upon the issue in a cause, in relation to the subject matter in controversy, which decides and settles the question of right between the parties, there an appeal will properly lie.

And whether an appeal will lie in any given case, is perhaps a question proper to be decided by this court only, being a question relating to its jurisdiction touching the rights of the citizen, which can be controled by no other court.

The main question presented by the bill and answer in this cause, is whether the money in controversy between the parties was deposited with *Hugh Thompson* by *Marcus Heyland,* for the use and benefit of the holders of certain bills of exchange which had been drawn by *Heyland;* or was paid to, and received by *Thompson* for his own use, in discharge of a debt due to him from the house of *William* and *John Bell* & Co. On that question the parties are directly at issue, the bill expressly charging that the money was so deposited for the use and benefit of the holders of the bills of exchange, and the answer of *Thompson* positively denying it, and avering that it was paid to him for his own use, and on account of a debt due to him from *William* and *John Bell* & Co. The solution of which question depends upon the construction of an agreement entered into on the 8th January 1811, between *Thompson* and *Heyland,* and filed as an exhibit in the cause.

It is obvious, therefore, that a decision involving the

construction of that agreement, is a decision of the whole matter in controversy, so far at least as *Thompson* is concerned.

The chancellor has given a construction to that agreement, and in doing so has expressly decided, "that *Thompson* has no right or title whatever to the money" in controversy; and on that decision, the order of the 12th of February 1825, to bring the money into court, is founded; in which order also the chancellor says explicitly, that *Thompson* received the money from *Heyland*, for the use of *Heyland's* creditors, the holders of the bills of exchange. The order then was passed upon the issue in the cause relative to the subject matter in dispute, and involves a decision of the question of right between the parties. It is of a character to draw after it the coercive process of the court of chancery, and as distinctly decides the matter in controversy, so far as respects *Thompson*, as if it was a final decree, and if wrong, is as much calculated to aggrieve the party, and therefore as properly the subject of an appeal.

The question next to be considered is, whether an appeal from that decretal order of the chancellor has been regularly taken, and properly brought before this court?

The act of 1713, *ch.* 4, for regulating writs of error, and granting appeals from and to the courts of common law, &c. directs, *(sec.* 4, 5,) as the "method and rule of prosecuting appeals and writs of error," that the party appealing, or suing out a writ of error, shall procure a transcript of the full proceedings of the court from which the appeal shall be made, or against whose judgment the writ of error shall be brought, under the hand of the clerk of the said court, and seal thereof, and shall cause the same to be transmitted to the court before whom such appeal or writ of error is or ought to be heard, tried and determined; and that all appeals so made shall be admitted and allowed by the superior courts to whom such appeals shall be so made in nature of a writ of error; and that every clerk of a court shall, at the time of the sitting of any court to which he belongs, and when any appeal shall be demanded, enter a memorandum of such demand, as well in his court's proceedings, as in the fair records of the proceedings of such court, under a penalty prescribed.

This act, it will be perceived, has no relation to appeals from chancery; but by the *third* section of the act of 1729, *ch.* 3, appeals from the court of chancery to the court of appeals, are directed to be prosecuted in the same manner as appeals from the courts of common law are. That manner, it is seen, is to demand an appeal, to procure a transcript of the proceedings under seal, and cause it to be transmitted to the appellate court, to be there admitted and allowed; of which demand, it is the duty of the clerk to enter a memorandum as well in his court's proceedings, as in the fair records of the proceedings of such court. All which has been done in this case; the appeal was demanded in the ordinary and usual mode, by way of motion to the chancellor to grant an appeal, which he refused.

A writ of error is mandatory, and does not leave it in the discretion of the subordinate tribunal to refuse or assent to the cause being carried up. By the laws of this state, appeals are placed upon the same footing with writs of error, and the same effect and operation given to them, with directions to the appellate court to admit and allow them. It was not, therefore, necessary that the chancellor should grant the appeal demanded in this case, to enable the party to bring it up; he was entitled to it as a matter of right, which could not be withheld, and had nothing to do, but to pursue the mode of prosecuting it, which is directed by the acts of 1713, *ch.* 4, *s.* 4, 5, and 1729, *ch.* 3, *s.* 3. This appears to have been done, and he is, we think, *rectus in curia.*

In *England* it has been thought right in principle that appeals should lie from chancery to a tribunal of ulterior jurisdiction, the House of Peers, without consulting the will of the chancellor on the subject. In this state the same principle is recognized, and this court, the court of appeals, is constituted the appellate tribunal; the difference resting only in the constitution of the respective appellate courts, and in the particular manner of carrying up or prosecuting appeals; the mode there being by *petition*, to the court of last resort, and here, by *demanding* an appeal according to the directions of the acts of assembly; but neither there or here, is it necessary that the appeal should be allowed by the chancellor, nor is any power vested in him to withhold it; it lies *ex debito justiciæ*, and is not granted by the chancellor *ex gratia.* Indeed, if not

1825.

Thompson
vs
M'Kim

distinctly admitted, it was scarcely denied by the counsel who closed the argument on the part of the complainants in the bill, that the appeal is properly before us. But it is contended that this court, constituted as it is, a mere appellate tribunal, without any original jurisdiction, has no authority to interpose, by order or otherwise, to suspend further proceedings in chancery, pending the appeal, on the matter from which the appeal is made.

It is difficult in this state to ascertain what has been the practice at different periods of our juridical history. Before the year 1729, the ultimate appeal was at one time to the King in Council; and by an act of the legislature of the then province, passed in the year 1721, appeals were given to the governor and council, but no mode of prosecuting or carrying them up was provided, and probably the mode of carrying up appeals in *England* was formerly pursued here.

But be that as it may, (and as far as concerns this case it is unnecessary to inquire,) the manner of prosecuting appeals does not now depend upon mere practice, but is expressly regulated by the positive provisions of the acts of 1713, *ch.* 4, *s.* 4, 5, and 1729, *ch.* 3, *s.* 3. The *second* section of the act of 1713, *ch.* 4, provides, that an execution upon a judgment obtained in a court of common law, shall not be stayed or delayed, or any supersedeas granted upon any appeal or writ of error from any such court, unless at the time of making the appeal, or suing out the writ of error, a bond shall be given with sufficient sureties, such as the justices of the court by whom the judgment is given, or the keeper of the seal, to whom application shall be made for such writ of error, shall approve, in double the amount of the sum recovered, &c. That section is confined exclusively to judgments obtained in courts of common law, and is not extended by the act of 1729 to decrees in chancery. There is, however, a practice of great antiquity grown up in chancery, to file a bond, at the time of taking an appeal from a decree of that court, on which all proceedings are stayed pending the appeal. This practice is supposed to owe its origin to the act of 1713, and to have been adopted in chancery by way of analogy to the provision of the *second* section of that act, in relation to the bonds required to be given in cases of appeal from judgments rendered in courts of common law,

1825.

Thompson
vs
M'Kim

which probably was the case; but as no appeal or writ of error will lie, except on a *final* judgment in a court of common law, that analogy can only hold in cases of appeal from *final* decrees in chancery; and there being nothing in the act of assembly prohibiting a stay of execution on appeals from chancery, without bond, the question is presented, whether if in such a case the appeal itself does not operate as a supersedeas, the power to suspend proceedings in chancery, pending the appeal, any where exists, and if it does in what tribunal it abides?

Formerly in *England* an appeal to the House of Lords, had *per se* the effect to stay proceedings in chancery, pending the appeal. That rule has since been changed, and now the general rule there is, that an appeal does not stay proceedings or execution, which can only be effected by order of the chancellor, on application made for that purpose, or by a special order of the House of Lords, which applications are made indiscriminately to the superior or inferior tribunal, though most regularly to the former; and the power of the House of Lords to cause a suspension, by special order, of proceedings in the court of chancery pending the appeal, is no where questioned, but is conceded as a necessary incident to its appellate powers.

In the state of *New York* the old rule in *England* has been adopted, and there the appeal does in the first instance stay proceedings on the matter or point appealed from, and the party wishing to proceed must, before he can do so, *apply to the chancellor for leave, (unless the court of errors should at the time be in actual session, and in possession of the cause,)* which is granted or not according to the circumstances of the particular case.

The constitution and principles of the court of chancery in this state, as in *New York*, originally emanated from the court of chancery in *England*, from which source we derive our principal stock of information in chancery jurisprudence; and the general rules governing the court of chancery there, so far as they are applicable, have been adopted here, and are constantly practiced upon. In *Huguenin vs. Baseley*, in 15 *Vesey*, 182, it is said by Lord *Eldon*, (in reference to the question whether an appeal to the House of Lords stayed proceedings pending the appeal,) to be very difficult to state positively what the law was before the year 1807. But by a general order of the House of Lords made in that year, in its appellate judicial

1825.

Thompson
vs
M'Kim.

and not legislative character, and adopted in conformity to the practice in chancery for a very long course of years, the rule is now settled, that an appeal has not the effect to stay proceedings; and in the same case the Lord Chancellor observed, it was "much more expedient that the application for an order to stay proceedings should be made to the House of Lords than to the court below."

The understanding in this state, (so far as the practice of filing a bond at the time of appealing affords any evidence of it,) is, that an appeal does not of itself stay execution of the decree; which understanding may have originally been borrowed from the practice at the time, of the court of chancery in *England*, and we have now no disposition to shake it, and can perceive no sufficient reason why it should not be recognized and adopted as a fixed and settled rule for the government of the court of chancery here. But it is manifestly necessary, to the ends of justice, that there should be a power in special cases to suspend proceedings on the matter appealed from; therefore in adopting the rule, that an appeal does not stay proceedings, we adopt it with its necessary incidents, which are, that pending the appeal, proceedings may be stayed either by order of the chancellor, on application made to him for that purpose, or by a special order of this court, on such terms as the peculiar circumstances of each particular case may be found to require.

The power of the House of Lords to stay or suspend proceedings by special order pending an appeal, is not an arbitrarily assumed power, but is incidental to that body, not in its legislative, but when sitting in its judicial character only, and it is necessarily incident to this court, to preserve the usefulness of its appellate jurisdiction. If it were otherwise, cases might arise in which the appeal would be but as a shadow, pending which the substance might be lost. It cannot be necessary to go into a specification of cases of that description, they must present themselves to every mind.

In this case, after the appeal was made, an application was preferred to the chancellor, to suspend proceedings on the order appealed from, which was refused, perhaps without an examination by the chancellor into the extent of his powers in relation to that subject.

That he had the power to suspend further proceedings on the matter from which the appeal was made, on proper

1825.

Thompson
vs
M'Kim

and reasonable terms, we have not the smallest doubt, and as little, that the same power also rests with this court, having the right of revision, we have all the powers necessary to the beneficial exercise of that right.

Is this then a fit case for the interposition of this court? The order of the chancellor is, that the appellant shall bring into court an amount exceeding $70,000, the use or interest of which sum, amounting to more than $4000 a year, would, by an enforcement of the order pending the appeal, be wholly lost to him, without any benefit whatsoever to the complainants; whereas the injury to the appellant would be irreparable, since in no event of the cause could the lost interest be restored to him, or any compensation for it be made. It is emphatically in such a state of things, that the power of this court, to cause by special order a suspension of proceedings on the matter appealed from, should be exercised, and not lightly, or in every cause; but where the court sees that if the decree or order appealed from should turn out to be wrong, the enforcement of it, pending the appeal, would produce an irreparable injury to the party appealing, it ought and will interpose to prevent such injury, or all the purposes of its institution, as an appellate court of chancery, will not be answered. But it will only interpose in such manner, and on such terms, as will not be prejudicial to the adverse party. Under the special circumstances, therefore, of this case, we think that the application by the appellant, for a special order to suspend proceedings in the court of chancery, on the order of the twelfth of February 1825, pending the appeal in this court from that order, ought to be gratified, on a bond being filed in that court by the appellant to the complainants, with condition suited to the nature of the case, and sufficient sureties to be approved by the chancellor.

The court, therefore, pass the following orders.

Western Shore, State of *Maryland*, sct.

By the Court of Appeals, June term, 1825.

Whereas it appears by the record of the proceedings of this court, that in a certain suit depending in the court of chancery for this state, in which *John M'Kim*, &c. are complainants, and *Hugh Thompson* and *John Bell* are defendants, an order was passed by the chancellor, bearing

Cate the 12th day of February 1825, which is in the following words, viz. [*Here follows the chancellor's order.*] And whereas the said *Hugh Thompson* hath appealed from the said order of the chancellor to this court, which appeal is now here pending. It is thereupon, this 11th day of July, in the year 1825, upon the petition of the said *Hugh Thompson*, the above named appellant, ordered by the court of appeals for the western shore, that all further proceedings in and upon the said order, and all process to enforce the same, be stayed and suspended in the court of chancery until the said appeal be heard and determined by this court; Provided the said *Hugh Thompson* shall file in the court of chancery a bond to the complainants in the court of chancery, in the penalty of one hundred and fifty thousand dollars current money, executed by the said *Hugh Thompson*, with sufficient sureties to be approved by the chancellor, conditioned, that if the said *Hugh Thompson* shall not prosecute with effect the appeal by him made and now depending in the court of appeals for the western shore, from an order passed by the court of chancery, on the twelfth day of February eighteen hundred and twenty-five, in a cause in that court depending, in which *John M'Kim*, junior, &c. are complainants, and *Hugh Thompson* and *John Bell* are defendants, ordering the said *Hugh Thompson* to bring into the said court, on or before the fourteenth day of April then next, the sum of thirty-nine thousand five hundred and seven dollars and eighty-five cents, being the value of eight thousand eight hundred and eighty-nine pounds five shillings and four pence, sterling, money of *England*, together with legal interest thereon from the first day of January in the year eighteen hundred and twelve; and shall not perform and fulfil the said order in case the same shall be affirmed by the court of appeals; and also shall not perform and comply with any order or decree, which shall be made on the said appeal by the court of appeals, and also shall not satisfy and pay to the said complainants all costs and damages that shall be awarded by the court of appeals, then the said bond to be and remain in full force and virtue, otherwise of no effect. And it is further ordered by this court, that a copy of this order, attested by the clerk of this court, and certified under the seal thereof, be forthwith transmitted by the clerk to the court of chancery.

MOTION AND ORDER GRANTED.