Bland, Chancellor,
Ordered, that the matter of this Petition be heard during the second week of the ensuing December term: And, that proofs be taken, as to the sufficiency of the sureties offered, before any Justice of the Peace, by either party, on giving reasonable notice of the time and place of taking the same to the opposite party, or their solicitor. And it is further Ordered, that the issuing of execution on the final decree in this case be stayed until the hearing of the matter of this petition or further order.
Under this order proofs were taken on the part of the defendant Samuel Ringgold, which, together with the deed of trust from him to Swearingen and Samuel Ringgold, Junr., and the inventory of the property conveyed by it, were returned and filed.
30th December, 1824. — Bland, Chancellor. The amount decreed to be paid having given to this matter a more than usual degree of importance; and the prayer of the petition calling for an expression *7 of the Court’s opinion as to the nature and extent of the citizen’s right of appeal, I therefore deemed it proper to appoint a day for hearing, so as to allow an interval within which the parties might be permitted to take testimony in support of their allegations, and so as to give time to look into the practice of the Court in relation to appeals, for the purpose of having the subject carefully reviewed and maturely considered.
It has always been regarded here, as well as in England, as a constitutional right of every citizen to have his case reviewed, in one form or other, by a court of error. (b) Under the Provincial government, this right of the citizen to have a revision of a judgment, in any civil case, affecting his interests, was extended, in many instances, beyond the court of the last resort, in the Province, to the king in council, (c) In reference to which extended right of appeal, the Constitution of the Republic has emphatically declared, “ that there be a Court of Appeals, composed of persons of integrity and sound judgment in the law, whose judgment shall be final and conclusive in all cases.”(d) So as thereby, in the most distinct and positive terms, to exclude and prevent the further prosecution of appellate proceedings, in any case, from that ultimate tribunal of the Republic, as had been before allowed under the government of the Province, (e)
This right of appeal seems to have been conceded to the citizen by the common law, in all civil cases, without check, or control of any kind whatever. (f) A writ of error was granted, on demand, as a matter of right ;(g) and, if the appellant was at all apprehensive, that proceedings, in execution of the judgment which had been so taken up by the writ of error, would not be stayed, he might, as of course, sue out a writ of supersedeas for the purpose of having all such proceedings suspended until a decision was had upon the writ of error, (h) The form of the writ of supersedeas, which followed, as the adjunct and auxiliary of the writ of error, was thus, “ that if the judgment be not executed before the supersedeas, the Sheriff is to stay from executing any process of execution until the writ of error is determined.” (i) Hence it was, and not from the quaint notion, that an execution being an entire thing which, when once begun, must be completed, that, if the fieri *8 facias had been levied, the Sheriff was bound to sell the goods and bring the money into court to abide the event of the writ of error. And this becomes the more evident on adverting to the fact, that, in many other cases, where no such special directions were given to the Sheriff, the proceedings, in execution of the judgment, were intercepted and cut short at the very point at which the writ of error or supersedeas might happen to find them. (j) But it has been long established, that the writ of error, with an approved bond to prosecute it with effect, of itself, operates as a stay of further proceedings to the same extent, that might have been specially directed by a writ of supersedeas; which writ, owing to that, although formerly always sued out in this State, (k) has long since become obsolete, and is now never resorted to as a mere auxiliary to a writ of error in any case whatever, (l)
But, although the right to appeal, in civil cases at common law, was thus, for a long time, admitted to' be absolute and beyond control; yet it was limited in its range to such facts as would have manifestly required a different course of proceeding and judgment, had they been made known to the Court; and to such errors in law as appeared upon the face of the record itself. And these errors in law, according to the common law mode of proceeding, could rarely be any thing more than such points of law as arose out of the allegations of the parties, in which no part of the evidence, which might have been offered in support of them, could appear; although, as to such evidence, and in their direction to the jury, the Court might have fallen into many and great errors. Hence it was, that the parties were, by statute, allowed to have any such matter inserted in the record, in the form of a bill of exceptions, so as to have the decision, in relation to it, revised and corrected, if erroneous, in a court of error. (m) But, whether the errors complained of were in fact, or in law; or whether they arose in an interlocutory proceeding, or in the last act of the Court, the party was not allowed to intercept the case in its progress, or to exercise his right of appeal, until the court of original jurisdiction had pronounced its final judgment; as in partition or account there could be no writ *9 of error allowed, but upon the final judgment;(n) nor could any -writ of error be brought to reverse even what might be called a final judgment upon any matter which rested in the mere discretion of the Court,(o) as for its refusal to continue a case;(p) or to grant a new trial ;(r) or to reinstate a case after a nonsuit or dismissal ;(s) or to allow a plea to be amended, or a new one to be filed ;(t) or the allowance of a commission between the discretionary limits of five and ten per cent, as prescribed by the acts of assembly, (u) And as a party cannot, with reason, complain of the error of a judgment which he had, by his negligence, suffered to go against himself, or which he had expressly consented should be passed, he is not allowed to have a writ of error upon a judgment by default against him;(w) nor where the proceeding or judgment was had by consent, or it had been agreed, that no writ of error should be brought, (x) These general limitations as to the range of the right of appeal, it is evident, are all of them well calculated to keep its exercise in order, and so far to prevent it from being abused.
But it having been found,. that this absolute right of appeal, even in cases in which it was clearly allowable, had been often abused, by being perverted to the mere purposes of delay, and by being made the means of putting the plaintiff’s claim again at hazard, after it had been at great trouble and expense sufficiently authenticated in a court of original jurisdiction, if appears, that a long series of efforts have been made to prevent or correct the evil without materially impairing the benefit of the right of appeal itself.
So far back as the year 1485, the Court of King’s Bench, laid it down as a rule of that court, that no writ of error in parliament should be allowed until some error was shown to it in the record, lest it should be brought on purpose to delay execution, (y) And in the next year, it was provided by the statute, that the party should recover his costs, and damages for his delay, and wrongful vexation in the same by the discretion of the court before whom *10 the writ of error was sued.(z) In the year 1581, it was made a rule of the Court of Common Pleas, that no supersedeas should be made upon any writ of error to reverse a judgment of that court until some manifest or pregnant error therein should be notified by the party, or his counsel, to the court or one of its judges, (a) In the year 1605, it was further provided, by statute, that in certain enumerated cases, no execution should be stayed upon any judgment unless the person, in whose name the writ of error was brought, should, with two sureties, acknowledge himself bound in a recognizance in double the sum recovered, to prosecute his writ of error with effect,(b) and by another statute, passed in the year 1661, the provisions of the previous law were extended to other cases, and it was declared, that, in case the judgment should be affirmed, the defendant in error should have awarded to him double costs for the delay of execution, (c) Soon after which, in the year 1664, the provisions of these statutes were further extended to almost all other cases, including by name, dower and ejectment; and it was declared, that, in case the judgment should be affirmed, the defendant should recover such costs, damages, and sums of money as should be awarded to him; and further, that the court wherein the execution ought to be granted, upon such affirmation, should issue a writ of inquiry, as well of the mesne profits as of damages hy any waste committed after the first judgment in dower or ejectment; and thereupon judgment should be given and execution awarded for the amount thereof.(d)
In addition to these statutory provisions upon this subject, the common law courts of Westminster Hall have undertaken, by the exercise of a sound discretion, to prevent the abuse of this right of appeal by refusing to stay execution where it can be shewn, that the writ of error had, in truth, been brought for the express purpose of vexation and delay.(e) The abuse of this right of appeal still, however, continues to be so great an evil in England, that it has been recommended as proper to oblige the defendant to bring the whole debt and costs recovered into court, as the only effectual means of preventing the practice, which too often prevails, of bringing writs of error for the mere purpose of delay. (f)
*11 When the appellant puts in bail in error, or gives security as required, notice thereof should be given to the opposite party; and, if he does not except, the bail is allowed; but, if he does except, then better bail must be justified in a manner similar to that of justifying special bail in an original action; and if the defendant fails to put in sufficient bail in error, the plaintiff may take out execution. (g)
In all tire States of our Union, it is believed that some statutes have been passed to prevent the abuse of this right of appeal. In Virginia, with a view to leave the right as open and as large as possible, and yet to prevent a party from resorting to it with any hope of great delay; it was made- the duty of the judges of the Court of Appeals to sit at least two hundred and fifty days, unless they should sooner despatch the business of the court, (h) And a statute of North Carolina has gone so far as to declare, that the party appealing shall give bond with surety to prosecute his appeal with effect; which bond shall be sent up as a part of the record; and, upon the judgment being affirmed, the appellate court may enter up judgment instanter, as well against the sureties as the principal in such bond for the amount recovered in the court below, with costs ánd twelve per cent, interest. (i)
In Maryland, the regulation of this right of appeal, with a view to prevent its abusive exercise, seems to have been the subject of early and repeated legislation,(j) prior to the passing of the existing law upon the subject,(k) by which all those English statutes in relation to the same matter, which had been adopted,(l) were virtually repealed so far as its provisions were, in any respect, incompatible with them. It would seem, that the English statute, which gave double costs on an affirmance of a judgment on a writ of error, had been adopted as a law of this State, although no instance may now be found in which such costs' have been awarded ;(m) and it is certain, that writs of enquiry, in actions of dower and ejectment, have been issued after an affirmance in error; and that judgments have been, entered on such inquisitions, although such writs of enquiry may have now fallen into disuse. (n) *12 But in the practice under our acts of assembly, in relation to appeals, there is no evidence to be found of any course of proceeding, analogous to that of the English courts, of justifying bail in error.
It seems, that originally all decrees- of the High Court of Chancery of England were final and conclusive. It not only appears, that no appeal from a decision of that court was allowed, prior to the year 1581; but, that the right of appeal, as then first introduced, remained entirely unsettled until, about the year 1662, when the matter was taken up; and, after having been much opposed, zealously debated, and maturely considered, was finally settled and admitted to be as much a constitutional right to appeal from a decision of the Hight Court of Chancery, as from a court of common law.(o) But as, at common law, no writ of error will lie from a judgment by default or by consent; so in equity the decree or order appealed from must have been adverse, and not made by the express or tacit consent of the appellant as when a party thinks proper not merely to decline opposition to measures which the court would enforce ;(p) but, by himself or his counsel, consents to a decree or order, there lies no appeal from it, even although he gave no such authority to his solicitor; his remedy being against his counsel ;(q) nor can any appeal be made generally available from a decree by default,(r) or, as it -would seem, from a decree taking the bill pro confesso.(s)
The general rule of the common law, which postpones, the exercise of the right of appeal until after the final judgment of the original court, is founded in sound sense; and, as is evident, should be as closely-followed as practicable in allowing appeals from the Court of Chancery. Therefore, it has been held, that no appeal can be allowed in equity, but from a final decree; or from an order grounded on some disputed facts. disclosed in the bill and answer involving the merits of the controversy; and which order, if executed, would subject the party to some irreparable *13 grievance ;(t) or from an order involving the merits, and which order could not be followed out without, in effect, depriving the pqrty of the benefit of. an appeal, or rendering any appeal thereafter, for correcting thev error of such order, entirely nugatory ;(u) yet it is perfectly manifest, from the very nature of the jurisdiction of the Court of Chancery, that the exercise of its various and flexible powers, which have been expressly so contrived as to afford relief in peculiar cases, and under emergencies which admit of no delay, where no 'just estimate, in anticipation, can be made of the,periled rights of the party, so as to have a satisfaction secured to him, by bond with surety, in the event of a loss; or where no adequate relief can be obtained otherwise than by a prompt exercise of the conservative powers of the court, an order may be called for, in the outset, or in the progress of a suit, the execution of which, if suspended on giving bond or otherwise, would be, in effect, to declare, that the court should exercise no such power. And, besides, if the progress of a suit in chancery might be delayed, by an appeal from any of the various interlocutory orders which the circumstances of the case might require, the suit itself, by such interruptions, by abatements, by loss of testimony, or other accidents, might never be brought to a final hearing; or the final decision might not be until after the subject in controversy itself had perished, or been entirely wasted.
Hence it is obvious, that there are many orders in chancery from which no appeal ever has been, or ought to be allowed. Such as an order to shew cause why any particular thing should not be done; or an order for an attachment to bring a party before the court; or an ex parte order refusing an injunction; or an order granting an injunction until the coming in’of the answer; or then, on motion, dissolving it;(w) or continuing it until the final hearing, or further order; or, where property was likely to be lost, or materially injured, an order appointing a receiver to take care of it for the benefit of all concerned ; (x) or an order upon a defendant to bring a sum of money into court, which he had admitted, in his answer, did not belong to him, for the purpose of having it invested so as to be made productive pending the litigation ;(y) or a mere discretionary decree or order, as *14 for costs; and the like. To allow a party, on giving bond, or upon any other condition, to appeal from such orders as these, so as thereby to suspend their execution, would be a scandalous abuse of the right of appeal;(z) it would be to palsy the arm of justice ;(a) and to make a chancery suit the greatest judicial nuisance that could well be imagined;(b) or, as has been justly observed, by sustaining appeals to such an extent, the court of the last resort would draw into it the whole business of the Court of Chancery, before it had become ripe for discussion and decision there; and not only render the voice of that court mute, and its process nugatory, but it would destroy the appellate court itself, by rendering it wholly incompetent to despatch the immensity of business which would be drawn into it.(c)
But as the record of a chancery suit contains all the proofs, as well as all the allegations at large, of the litigants, with a recital, previous to the exhibits read, of the Substance and scope of the pleadings, tending to the points in controversy upon which the decree is made, drawn up, as directed by the rule and practice, in the most concise manner, by the register, under the inspection of the solicitors of the parties, of what was alleged, relied on and proved at the hearing, as being parcel of, and as shewing the foundation upon which the court had rested its final decree; the whole of which, by an appeal, is removed to the court above ;(d) therefore, in order to prevent the appellant from making a fraudulent, or abusive use of his right of appeal, by laying back, at the final hearing in chancery, for the purpose of taking his opponent by surprise in the appellate court, by insisting on testimony not previously relied upon; or by taking exceptionSj or making points not taken or made in the court below, it has been laid down, in general, that no evidence can be read and relied on in the appellate court, which was not read and relied on in the court of chancery ;(e) that no exceptions can be taken, or point made, by way of appeal, which had not been taken or made in the court below;(f) that *15 no new matter, not in issue in the court below, can be insisted on in the court above ;(g) and that no account which was not asked for at the hearing below, can be made the ground of appeal. (h)
Whence it appears, although in equity as well as at common law, the parties, after framing their allegations to suit the peculiar nature of their case, are allowed sufficient time and means to bring in all their proofs; and are then permitted to take any exceptions, and to make any points they may think proper, that yet they are not suffered, by an appeal, to cast their case into a new shape; or to give it anew, or different aspect in any respect whatever; since the sole object of an appeal, in all cases, whether at law, or in equity, is not to allow the appellant to present a different, or a better case; but merely to enable the appellate court to correct such errors as it may appear the inferior court had fallen into, upon a review of the identical case upon which the court below had decided, and nothing more.
No statutory provisions have been made in England for the purpose of regulating the right of appeal from the Court of Chancery, or for preventing its abuse; and therefore the matter has been hitherto entirely governed by such rules as have been laid down by the original and appellate tribunals themselves, upon due consideration of the peculiar nature of the subject.(i) It is admitted, that very grave reasons should be required to induce the court to refuse the benefit of appeal;(j) and that any interference with the right of appeal is a delicate subject, to be applied with jealousy.(k) Nevertheless, as it would be attended with consequences most oppressive, to suitors in equity, if an appeal were allowed, of itself, to operate as a stay of proceedings, it has long been the established practice of the Court of Chancery to consider an appeal as, in no case, having the effect of suspending its proceedings, unless an order for that purpose is made by the court itself; or unless, in special cases, the appellate court should interpose by a special order. (l) And, even if the decree were absolute and final, yet, if it were of such a nature, that the consequence of suspending its execution would, in effect, be, if the party in whose favour it had been made should die before the appeal could be heard, a reversal of the decree without any judgment of the court, the proceedings would not be stayed, (m) The Court of Chancery appears to have *16 been governed, in this respect, by a sound discretion upon a consideration of the peculiar nature of each case; so that, in fact, the hearing of a petition, to stay its own proceedings, pending an appeal, is, in some sort, a summary rehearing of the case itself, (n)
Upon all such occasions, however, the court gives a certain degree of credit to its own decree, supposing it to be right, unless strong ground is shewn for a contrary conclusion, more than the mere dissatisfaction of the party appealing. And, in order to induce the court to regard the case as reasonably doubtful, at least two counsel, who the court will not presume to act so unworthily as to state what they do not know and believe, must certify, that, in their opinion, there is just cause for appealing.(o) It must appear, that the application for an appeal has not been unreasonably delayed ;(p) and, although an appeal may be taken from a decree to account, yet the court will proceed to have the account taken pending the appeal.(q) In granting a stay of its proceedings, the Court of Chancery, generally, imposes such terms, by ordering the sum decreed to be paid into court, and so invested as to be productive pending the appeal, or by appointing a receiver, or by requiring such security, as will afford to the party in whose favour the decree has been made a reasonable assurance, that there shall be no unjust delay in prosecuting the appeal, or any material loss, or irreparable injury sustained by a suspension of the proceedings, (r)
In England, the rules prescribing the extent of the right of appeal-from the inferior Courts of Admiralty, and the regulations by which its exercise is prevented from being abused, are nearly similar to those by which the right of appeal is limited, and its exercise restrained from decrees of the High Court of Chancery, (s) Here, however, in the federal courts, no appeal is allowed in any case of admiralty and maritime jurisdiction, but from the final decree, or sentence of the court;(t) and, if such final decree be not appealed from, no appeal lies from any subsequent proceeding upon the summary judgment rendered on a bond for the appraised value, or. upon an admiralty stipulation taken in the case to enforce the decree; *17 the proceedings in such cases, and the awarding of execution being considered incidents exclusively belonging to the court in possession of the principal case.(u) So too in the federal courts there can be no appeal in a chancery suit, but from the final decree, (w) A decree for the sale of mortgaged property has been deemed a final decree within the meaning of the act of Congress; (x) but it has been held, that an order overruling a plea of the statute of limitations, and directing the defendant to answer ;(y) or an order dissolving or refusing to dissolve an injunction, is not a decree from which an appeal will lie. (z) It is believed, that in all the States of our Union, in which distinct Courts of Chancery exist, or in which any of their inferior and original tribunals have been invested with the powers of a Court of Chancery, the range of the right of appeal has been more or less limited; and that some regulations have been adopted with a view to prevent the abuse of its exercise.(a) In North Carolina all original jurisdiction in equity, beyond a small amount, was given exclusively to the Superior Courts of Law and Equity, which were, at one time, courts of last resort, and, of course, there could be no appeal in equity from any of their decisions.(b)
In Maryland, although it appears, that the Court of Chancery was one of the earliest of the judicial establishments of the Province, yet there is nothing which shews, that an appeal was ever allowed from any of its decrees, until it was expressly provided for by the legislature. The act for regulating writs of error and granting appeals from and to the courts of common law;(c) is, as its title indicates, like all the previous acts upon the same subject, expressly confined, in all its provisions, to cases at common law; and has been followed out by a practice, in some particulars, different from that of the English courts in like cases.(d) The existing act of assembly, which allows of appeals from Chancery, seems to have been a re-enactment of a law which had been passed a few years before ;(e) it enacts, that it shall be lawful for any person who conceives himself “ aggrieved by any decree of the Chancery Court, to have an appeal to the governor and council,” the then court of appeals.(f) It is not said, that the right of appeal shall be *18 extended to any order, decision, or decretal order, but simply to “any decree of the Chancery Court;” whence, it would seem, that the right of appeal might have been, and, there is some reason to believe, actually was construed, under that law, to extend only to final decrees, (g) But it is well known, that the Court of Chancery of Maryland had, from the very outset, and always, governed itself according to the principles and rules of its prototype, the Court of Chancery of England ;(h) and that the right of appeal was not confined to mere final decrees, seems to have been admitted and affirmed by one of the most important and best considered acts of assembly, in relation to matters of equity; in which it is said, *19 “that all appeals from the decisions, orders, and decrees of the Chancery Court, in cases where appeals properly lie,” shall be made within nine months, &c. ;(i) which declaration, it was after-wards enacted, should “be confined to decretal orders.”(j) Whence it may be fairly inferred, that although the range of the right of appeal might have been, under the previous laws, construed to be, at least, coextensive with the right of appeal from the Court of Chancery of England, yet by this last law it was intended to reduce it within much narrower limits, by declaring, that it should “be confined to decretal orders.”
Consequently, although it may be questionable, in many cases, whether an appeal, which would be allowed in England, should be granted here, yet it would seem to be perfectly clear, that where an appeal will not lie from the English Court of Chancery, it cannot now be granted from this court, (k) Hence, as it is settled in England, that there can, in general, be no. effectual appeal from a decree by default; or from a decree, to the passing of which the party has assented; or which, by his negligence or omission, he has permitted to go against him, it would seem necessarily to follow, that no.appeal ought to be allowed to a party against whom any such decree had been passed by this court, either in the ordinary course, or according to the special provisions of the act of assembly, which authorizes the court to proceed ex parte ;(l) or under any of the acts which authorize the court to take the bill, pro confesso, as against an absent, or a contumacious resident defendant; since the right of appeal has been reserved to such a party by no act of assembly, in any case whatever; and if he were, notwithstanding, to be suffered to appeal, such a decree would be thereby rendered, in a great measure, utterly futile; and he might thus be enabled to turn his own negligence to his particular benefit,‘by taking advantage of errors and omissions in the proceedings, which must have been waived, or might have been cured, or provided for, had he appeared and answered. But this is a matter which yet remains to be carefully considered and finally determined by the proper tribunal.
The act for regulating the granting of appeals from and to the courts of common law, declares, that the method and rule of the prosecution of appeals shall be in the manner and form as therein expressed, that is to say, the party appealing shall procure a tran *20 script of the full proceedings of the court whence such appeal shall be made under the hand of the clerk of the said court and seal thereof, and shall cause the same to be transmitted to the court before whom such appeal is to be heard; and also in the same court file, in writing, according to the rule of the same court, such causes, or reasons, as he had for making the appeal; upon which transcript the Court, to whom the appeal shall be made, shall proceed to give judgment.(m) After which the legislature further declared, “that appeals from the Court of Chancery to the Court of Appeals, shall be subject to the same regulation and limitation, as to the prosecution of them, as appeals from the courts of common’law are.(n) But there is no act of assembly which directs, that the execution of a decree in chancery shall, in any case, be stayed on the appellant’s giving bond, with sureties, for the prosecution of his appeal or which, in any manner whatever, prescribes the terms upon which any appeal may be granted; or the conditions upon which the execution of any. decree of the Court of Chancery shall be delayed until the appeal can be heard and determined. As to all such matters, therefore, this Court has always been, as it now is, governed by the analogous practice of our own courts, so far as it can be so considered, and by the rules and practice of the English Court of Chancery in like cases.(o)
There are some cases to be found among the proceedings of the Chancery Court, during the provincial government, in which it appears, that, here as in England, the decree has been introduced by a brief recital of the allegations and proofs in the case; but there are few instances of the kind to be met with since the revolution.(p) Nothing, however, has been more common than for the Chancellor himself to state the case and to give his opinion, in writing, upon it as introductory to his decree. But neither of these modes of proceeding can be, or indeed ever have been regarded by tire appellate court as sufficiently showing what were the exceptions and points in controversy before the court below. In the recital of the allegations and proofs it could not but often happen, - that much was stated which had not been at all controverted; and as the recital was made under the sanction of the Chancellor it *21 followed, on the other hand, that much matter, might have been put aside, or omitted, which one or other of the parties had deemed of great importance, and upon which he had earnestly relied, (p) The opinion of the Chancellor, it is also evident, should still less be relied on as to what were the points made before him; because, like all other judges, he expresses an opinion on such points only in the case as appears to him to be decisive; and passes over all others unnoticed; or, indeed, as sometimes, though rarely happens, he takes a view of the case which renders it wholly unnecessary to pay the least attention to any one of the points that have been made by either of the parties to the controversy.(q)
Yet it is all important to the due administration of justice, in all cases, that “the full proceedings of the court,” appealed from, with an exact exhibition of the exceptions and points there taken and made, and nothing more, should be as amply and correctly spread out and presented before the revising and appellate court as they were before the court below. For it is perfectly manifest, that, as on the one hand, the case should not be taken in fragments, upon successive appeals, or with any additions ;(r) so, on the other, the parties should not be permitted to deviate from or enlarge the ground occupied by them, in the court below, by' taking any other exceptions, or making any new points. Because, in passing upon any such new matter the Court of Appeals cannot act, according to the terms of its constitution, merely as a tribunal for the revision and correction of errors; but must necessarily step beyond its legitimate orbit, and take upon itself the power of a court of original jurisdiction, (s) And by thus suffering itself, in any respect, to put forth a power, beyond its appropriate sphere, it must inevitably draw to itself much business not properly belonging to it; and often take the parties by surprise with exceptions and points which h&d never before been thought of; or which had been, until then, purposely concealed, in order to defeat a party of his just right as authenticated by the judgment of the court below; where all such new objections might have been readily removed, had they been then made, and the parties apprised of them at the proper stage of the controversy.(t)
*22 There is, however, nothing to be met with in the proceedings of this court going to show, that the Court of Appeals has, at any time, in chancery cases, rigidly confined itself to the exceptions and points made in the court below; and, perhaps, that court might find it difficult to do so, unless some written evidence of the exceptions taken and points made, in this court, were placed upon the record. — And therefore it might be well, to have it enacted, by the legislature, as a general rule, in all cases of appeal from the Court of Chancery, that a party should not be allowed to take any exception, or make any point in the Court of Appeals, which he had not taken or made in writing and filed, before the hearing, in the Court of Chancery, (u)
It appears, that this Court has always exercised a discretionary power over the right of appeal, analogous to that exercised by the courts of common law and of chancery of England, so far as to prevent its abuse, in being taken frivolously, vexationsly, or for the mere purpose of delay, by refusing to grant an appeal from every order with which a party may be dissatisfied; or by refusing to stay the execution of the order or decree, but upon certain terms, or until the party had given bond with sufficient sureties, as required by the act of assembly in cases at common law, to prosecute his appeal with effect ;(w) and it must also appear, that the *23 appeal has been taken from the order or decree within the time limited by the act of Assembly. (x)
Where the order or decree, appealed from, simply requires the payment of a sum of money, and nothing more, the rule has been, as at law, to require an appeal bond in double the sum so directed to be paid, and costs, (y) But on an appeal from a decree to foreclose a mortgage of land; or for the sale of mortgaged land; or for the conveyance of land in specific performance of a contract, and the like, it would be unnecessary and improper to require a bond in double the amount of the mortgage debt; or in double the value of such an estate so bound; which, although subject to much injury, is yet in substance imperishable and immoveable; and therefore, in such cases, the practice has been to follow the course pursued at law, in the analogous cases of writs of error in dower and ejectment, and to require an appeal bond in such a sum as will cover the whole amount of the costs and of the mesne profits as well as damages by any waste committed pending the appeal, which the statute authorizes the party to have ascertained at law by a writ of inquiry, and to recover, in case the appellant should fail to sustain his appeal, (z) But where the plaintiff in equity seeks a *24 specific performance of a contract, or the benefit of the decree can only be had by the delivery, preservation, or sale of certain moveable and perishable property, then it is clear, that the penalty of the appeal bond should be form sum at least double the value of such property as well as the costs, and any particular sum of money which such decree may. also direct to be paid. There does not appear, however, to have been any rule laid down by which the value of such property is to be ascertained, for the purpose of fixing the penalty of the appeal bond. The extent of the original jurisdiction of the Federal. Courts, as well as the extent of the right of appeal from them, has been limited by act of congress to cases where the matter in dispute exceeds the. sum or value of a certain specified amount, (a) In regard to which it has been held, that where, frorp. the nature of the action, as in detinue, replevin, ejectment, a writ of right, or admiralty proceeding in rem for a forfeiture, the property itself, and not a debt or damages, is the matter in dispute, the value may be ascertained by affidavits taken on reasonable notice to the adverse party, or his counsel;(b) and this it is evident, would be the proper course to pursue for the purpose of bringing before this Court the means of making a just estimate of the value of the property, in case its value should be disputed, in order to ascertain what should be the penalty of the appeal bond in appeals from orders or decrees in relation to subjects of this latter description, (c)
In England, bail in error is given by a recognizance acknowledged in the court below; and if the sufficiency of the bail is excepted to, the party is thus called on to justify, or put in better bail. According to the English course in Chancery, where a party is called upon to give an appeal bond, or to enter into a bond, or recognizance, for any other purpose, he is required to do so before a master, by whom the obligation must be authenticated, and the surety approved. In Maryland, the practice in Chancery is different, and.although there are many cases, as well as those of appeals, in which a bond with approved surety is required to be given; yet there is no instance in which a bond has been, like a recognizance, required to be acknowledged or executed before the Chancellor, or any officer of the court; and I have met with but one instance in *25 which any evidence of the authenticity or proof of the execution of such a bond has been produced to the Chancellor, (d) Although in some cases certain office bonds have been required to be authenticated before, some of the judges of the courts of common law; and to be thereupon recorded.(e) But in all cases in Chancery the authenticity of the obligation has been assumed, or admitted, and the approval of the Chancellor, which is so often spoken of, is confined; first, to the conformity of the instrument to the requisitions of the law, or of the order or decree, in pursuance of which it had been given; and in the next place, to the pecuniary sufficiency of the obligors. It is necessary, that the penalty of the bond should be double the whole amount recovered, or ordered to be paid, and costs; or in the amount specified by the Chancellor in those cases where it has been submitted to his discretion to fix the amount; and also, that the condition should correctly set forth the judgment, decree, or order appealed from, or the object of the bond; or that duty, the faithful performance of which is intended to be secured by it. If the bond be not correct in these particulars, it cannot operate as a supersedeas, or so as to stay the execution of the order or decree; and therefore on the fact being shown to the Chancellor the party will be permitted j,o proceed to obtain the benefit of his order or decree, (f)
The pecuniary sufficiency of the sureties offered is, however, in this respect, a matter of the first and greatest importance. For although the terms of the obligatory instrument may be, in every particular, exactly as required; yet, if the sureties be insufficient, or insolvent; or become so before the event happens which authorizes the party to have recourse to it for the purpose of obtaining the relief which it was intended to secure to him, it is, in point of fact, as if it had never been given, or as if it had been originally a mere nullity; and therefore, in all such cases sureties should be given who are not only then sufficient; but who are likely to be so when tire contemplated event shall happen. Where money is *26 to be paid, or some duty is to be performed, within some short space of time, a continuance of the solvency of a surety may be much more confidently relied on than where the debt is to be paid, or the duty to be performed at some distant day. But in reckoning upon the probability of a surety’s continuing to be solvent, during any given period, various other circumstances must be taken into consideration as well as the lapse of time; his continuing solvency may depend, in a great degree, upon the regular or irregular, certain or hazardous business in which he may be engaged; thus, an agriculturalist, of the same extent of sufficiency, is more likely to continue solvent for the same space of time than a merchant.(g) The continuing solvency of a surety may also, in some measure, depend upon the kind of property held by him, as being such as is ordinarily acquired with a view to a permanent holding; such as land for cultivation; or such as personal properly procured for consumption, or .for the purpose of barter or traffic, which is easily alienated, (h) Hence it is, that many of- our legislative enactments have required freeholders, ór “ persons of visible and landed estates,” to be given as sureties, where their solvency was required to endure for any length of time.(i) The continuing solvency of a surety may, likewise, in some degree, depend upon the state of society in the country. In England, and in most other countries of Europe, property is either not so free, or it does not, or cannot be made to change hands so easily and so frequently as in ours. That very bold spirit of active enterprize of our citizens which is, in a great degree, the result of our free institutions; and the unfettered rights of all property, render the continuance of the solvency of all persons, for any length of time, less certain here than elsewhere.
In Maryland, however, a practice has long prevailed, as to the mode of showing the sufficiency of appeal bonds, and other such securities, which the Chancellor has been in various ways authorized or called upon to demand and approve, by which all these considerations seem to have been disregarded or totally put aside. For although it was, on the 7th of March, 1793, laid down as a standing rule, that no officer of this court or his deputy should be admitted as a surety in any such bond; and also, by the rule of the 14th of November, 1801, that the sureties in such bonds should reside within the jurisdiction of the court; yet, in all other respects, *27 it has been deemed enough to lay before the Chancellor a bond regularly drawn, and which purports to be the authentic instrument of those whose signature it bears; and, if the. pecuniary condition of the obligors be known to the Chancellor, he approves or disapproves of it accordingly; but, if the Chancellor has not himself a full knowledge of the situation of the obligors, then their sufficiency must be certified to him by some other judge, by a justice of the peace, or by one of the solicitors of the court; upon which the bond is at once approved without notice to the opposite party, or further inquiry of any sort;(j) for it has rarely, if ever, happened, that the approval has been opposed, as by exceptions to bail in error, or to special bail; and, if any such were taken, there does not appear to be any settled mode of proceeding, by which to cause the sureties to justify, to ascertain their sufficiency, or to have better sureties given, which would not be-attended with much trouble and delay. Such certificates of sufficiency, it is certain, are, in many cases, too easily obtained; yet there appears to be no adequate mode of correcting the evil. The court might censure or punish one of its own solicitors who should carelessly or unworthily certify sureties to be sufficient who he knew were not so; but the Chancellor can exercise no such authority over a judge, or a justice of the peace; and yet the most of such certificates come from justices of the peace. The legislature may provide some mode of guarding against these evils ;(k) but until they have done so, this .court must, in general, follow the existing and long established practice. The court does not, however, mean -to say, that such certificates are to be considered as, in all respects, final and conclusive evidence of the sufficiency of the sureties offered; on the contrary, exceptions may be taken and proofs read; and then, if the sureties offered, on a fair estimate of the whole, and on due consideration of all circumstances, appear to -be insufficient, the bond will be rejected.(l)
From all that has been presented to the court, in the case under consideration, and on making a fair estimate of the pecuniary *28 ability of all the obligors in the bond, which the court is asked to approve, there appears to be an ample sufficiency to answer tire amount of tire decree should it be affirmed. This court cannot allow itself now to depart from the existing practice, or undertake to introduce any new rule in restraint of the right of appeal, which seems to have been always most liberally indulged. To sustain the objections, that have been urged upon the present occasion, would be, in effect, to put aside a practice which seems to have been long settled with the entire understanding and approbation of the whole community.
Whereupon it is Ordered, that the said petition be dismissed, with costs, and that the bond be approved.

 Christie v. Richardson, 3 T. R. 78.

 1773, ch. 7, s. 5.

 Const. art. 56.

 Hammond v. Ridgely, 5 H. & J. 268.

 Tidd, Pra. 1074.

 D. Regina v. Paty, 2 Salk. 504.

 Jac.L.Dic. vide Supersedeas.

 Meriton v. Stevens, Willis, 281.

 Jac. L. Dic. vide Supersedeas.

 Land. H. A. 146. Chan. Pro. lib. C. D. 368. A fee was formerly allowed to the Chancellor, which was afterwards directed to be paid into the treasury, for putting the great seal to a writ of error, and also a distinct fee for putting the great seal "to a supersedeas thereupon” — 1763, ch. 18, s. 88; Oct. 1777, ch. 13; November, 1779, ch. 25, s. 22.

 2 Bac. Abr 477.

 Tidd, Pra. 787; 1 Hal. Const. H. Eng. 9, note.

 2 Bac. Abr. 454; Samuel v. Juden, 6 East, 333.

 Davis v. The State, 3 H. & J. 154; Gover v. Cooley, 1 H. & G. 7; Liter v. Green, 2 Wheat. 306; Parsons v. Bedford, 3 Peters, 445; Boyle v. Zacharia, 6 Peters, 648.

 Wood v. Young, 4 Cran. 237.

 Henderson v. Moore, 5 Cran. 11; Marine In. Co. v. Young, 5 Cran. 187.

 United States v. Evans, 5 Cran. 280; Welch v. Mandeville, 7 Cran. 152.

 Marine In. Co. v. Hodgson, 6 Cran. 206.

 1798, ch. 101, subch. 10, s. 2; Nicholls v. Hodges, 1 Peters, 562; 1828, ch. 26, s. 5.

 Hawkins v. Jackson, 6 H. & J. 151, note.

 Dormer’s Case, 5 Co. 40; Clare v. Linch, T. Raym. 372; Wright v. Nutt, 1 T. R. 388; Camden v. Edie, 1 H. Blac. 21.

 Tidd, Pra. 1074.

 3 Hen. 7, c. 10; Tidd, Pra. 1131; Kilt. Rep. 228; Shepherd v. Mackreth, 2 H. Blac. 284.

 Tidd, Pra. 1074.

 3 Jac. 1, c. 8; Tidd, Pra. 1075.

 13 Car. 2, Stat. 2, c. 2, s. 10 ; Shepherd v. Mackreth, 2 H. Blac. 286, 3 Blac. Com. 410.

 16 & 17 Car. 2, c. 8.; Tidd, Pra. 1081.

 Entwistle v. Shepherd, 2 T. R. 78; Christie v. Richardson, 3 T. R. 78; Pool v. Charnock, 3 T. R. 79; Kempland v. Macauley, 4 T. R. 436.

 Tidd, Pra. 1075, note.

 Tidd, Pra. 1087.

 2 Mun. Rep. Intro. 17.

 Yarborough v. Giles, 1 Hayw. 453; Kinchin v. Brickell, 2 Hayw. 49.

 1642, ch. 6 & 34; 1678, ch. 8; 1692, ch. 9; 1695, ch. 19; 1699, ch. 10; 1704, ch. 32, and 1712, ch. 5.

 1713, ch. 4.

 Kilt. Rep. 88, 92; 228, 239.

 Gale v. The Proprietary, 1 H. & J. 343, note. Kilt. Rep. 92.

 Joan v. Shields, 3 H. & McH. 7; Gore v. Worthington, 3 H. & McH. 96; Kilt. Rep. 239.

 Gilb. For. Rom. 190; 1 Harr. Pra. Chan. 676; 2 Mad. Cha. 573; 2 Lond. Jurist. 107.

 Wood v. Griffith, 19 Ves. 550, 1 Meriv. 35.

 Downing v. Cage, 1 Eq. Ca. Abr. 165; Buck v. Fawcett, 3 P. Will. 242; Harrison v. Rumsey, 2 Ves. 488. Bradish v. Gee, Amb. 229; Beresford v. Adair, 2 Cox. 156.

 Cunyingham v. Cunyingham, Amb. 89; Stubbs v. -, 10 Ves. 30; Charman v. Charman, 16 Ves. 115.

 Davis v. Davis, 2 Atk. 24; Maynard v. Pomfret, 3 Atk. 468; Carew v. Johnson, 2 Scho. & Lefr. 300; Jopling v. Stuart, 4 Ves. 619; Geary v. Sheridan, 8 Ves. 192; Ogilvie v. Herne, 13 Ves. 563; Heyn v. Heyn, Jac. Rep. 49.

 Blount’s Case, 1 Atk. 295; Head v. Harris, 2 Scho. & Lefr. 563; Roche v. Morgell, 2 Scho. & Lefr. 724; Buel v. Street, 9 John. Rep. 447; Snowden v. Dorsey, 6 H. & J. 114.

 Waldo v. Caley, 16 Ves. 214; Wood v. Milner, 1 Jac. & Wal. 616.

 Since altered by 1832, ch. 197.

 Altered by 1830, ch. 185, s. 1.

 Altered by 1830, ch. 185, s. 1; Thompson v. McKim, 6 H. & J. 327, contra.

 Way v. Foy, 18 Ves. 453.

 Huguenin v. Baseley, 15 Ves. 183.

 The Warden of St. Paul’s v. Morris, 9 Ves. 318.

 Buel v. Street, 9 John. Rep. 448; 2 Mun. Rep. Intro. Judge Tucker’s letter, 17; Debates Virg. Conv. of 1829, page 760; The Warden of St. Paul’s v. Morris, 9 Ves. 316; Cowper v. Scott, 1 Eden, 17; Wirdman v. Kent, 1 Brow. C. C. 140; Jenour v. Jenour, 10 Ves. 572.

 Gilb. For. Rom. 162, 184, 190; Pra. Reg. 127; 1 Harr. Pra. Chan. 77, 620; 2 Harr. Pra. Chan. 664; White v. White, 4 Ves. 35; 2 Fow. Exch. Pra. 164; Broad v. Broad, 2 Cha. Ca. 161; Gifford v. Hart, 1 Scho. & Lefr. 396; Carew v. Johnston, 2 Scho. & Lefr. 308;

 Cunyngham v. Cunyngham, Amb. 90; Button v. Price, Pre. Cha. 212; Keen v. Stuckely, Gilb. Rep. 155; Wood v. Griffith, 19 Ves. 550.

 Chamley v. Dunsany, 2 Scho. & Lefr. 712.

 Thompson v. Waller, Pre. Chan. 295.

 Chamley v. Dunsany, 2 Scho. & Lefr. 712.

 2 Fow. Exch. Pra. 202.

 Wood v. Griffith, 19 Ves. 551.

 Way v. Foy, 18 Ves. 454.

 Waldo v. Caley, 16 Ves. 213.

 Waldo v. Caley, 16 Ves. 214; Wood v. Milner, 1 Jac. & Wal. 616.

 Willan v. Willan, 16 Ves. 217; Monkhouse v. The Corporation of Bedford, 17 Ves. 380; Wood v. Griffith, 19 Ves. 551.

 Huguenin v. Basely, 15 Ves. 183.

 Savage v. Foster, 9 Mod. 38; Gwynn v. Lethbridge, 14 Ves. 585.

 Popham v. Bampfield, 1 Vern. 344; Nerot v. Burnard, 2 Russ. 56.

 Willan v. Willan, 16 Ves. 216; Monkhouse v. The Corp. of Bedford, 17 Ves. 380; Way v. Foy, 18 Ves. 452; Huguenin v. Basely, 15 Ves. 180.

 Clarke’s Praxis, tit. 54 & 55.

 Act. Cong. 24th Sept. 1789, ch. 20, s. 21 & 22.

 The Hollen & Cargo, 1 Mason, 431.

 Act Cong. 24th Sept. 1789, ch. 20, s. 22.

 Ray v. Law, 3 Cran. 179.

 Rutherford v. Fisher, 4 Dal. 22.

 Young v. Grundy, 6 Cran. 51; Gibbons v. Ogden, 6 Wheat. 448.

 7 John. Cha. Ca. Gen. Index, 22; Hening & Munford’s Rep.; 4 Desau. Rep.

 Haywood’s Rep.

 1713, ch. 4.

 The State v. Buchanan, 5 H. & J. 331.

 1718, ch. 10; 1720, ch. 20

 1721, ch. 14, s. 3.

 Slye v. Llewellin, May, 1721. — On motion of Mr. Daniel Dulaney, of counsel for the defendant, it is ordered, that the Injunction in this cause be dissolved; and that there go an order to the Sheriff to repossess Mr. Richard Llewellin, the defendant, with the lands in the bill mentioned, pursuant to a former order of this Court, made May, 1719; and that the bill be retained; and ordered hearing next court. Whereupon Mr. William Cuming, of counsel for the complainant, moves for an appeal from this order to the High Court of Appeals, the Injunction being dissolved, and a writ of possession ordered. Which appeal is denied by his Honor the Chancellor, the cause being not yet determined. — Chan. Proc. lib. P. L. 595.

 Cowell v. Seybrey. — Mr. Moorecroft, attorney for the plaintiff; moves against the defendant for a commitment against him to the Sheriff of Saint Mary’s county, until he do pay his contempt, and put in a perfect answer to the complainant’s bill, there being an attachment issued against him for want of an appearance. Mr. Rozier, attorney for the defendant, puts in a demurrer to the plaintiff’s bill. Mr. Moorecroft prays the judgment of the Court upon the said demurrer; and further moved, that the defendant was summoned to answer, and ought not to put in a demurrer.
2ct June, 1669, Galvert, Chancellor. — The defendant, upon serving of a subpoena to appear and answer, may put in a plea, answer, or demurrer; and the same shall stand good as if he had put in an answer, according to the practice of the Chanceiy Court in England, the rules of which court, as to that particular, were read. tVhereupon it is ordered, that the said demurrer be set down to be argued upon Friday next, of which all parties concerned are hereby to take notice
In this cause, the Court caused the late Sheriff of Talbot county, to whom it was alleged the said attachment was directed, to return his writ; he doth not appear, nor had he returned that writ to the new Sheriff, being present in court.
It was thereupon ordered, that the respective Sheriffs of the respective counties within this Province, do, by themselves, or their deputies, or attorneys, attend every court held here at Saint Mary’s, for the Chancery and Provincial Courts, to answer to the said Courts for the return of writs to them directed, as they will answer the contrary to the said Courts at their perils. — (1785, ch. 72, s. 23.)
Ordered likewise, that tire said defendant Seybrey do pay unto the plaintiff, or his attorney, twelve shillings and sixpence for his costs upon the contempt of setting an attachment; that he be committed to the custody of the Sheriff of Saint Mary’s till he pay the same. The defendant said he had no money; but Mr. Rozier, his attorney, engaging, in open court, to pay the same, the said commitment is discharged. — Chan. Proc. lib. C. D. 5; 5 Franklin’s Works, 355; Digges’ Lessee v. Beale, 1 H. & McH. 71.

 1785, ch. 72, s. 27.

 1818, ch. 193, s. 1.

 But see 1830, ch. 185, and 1832, ch. 197.

 1820, ch. 161, s. 1.

 1713, ch. 4, s. 4.

 1729, ch. 3, s. 3.

 But see the act passed since 1826, ch. 200.

 The Proprietory v. Jenings, 1 H. & McH. 140; Sparrow v. Gassaway, 1733; Chan. Proc. lib. J. R.; No. 2, p. 405; O’Brien v. Connor, 2 Ball 6 Bea. 146; Gregory v. Molesworth, 3 Atk. 627; Ex parte The Earl of Ilchester, 7 Ves. 373.

 O’Brien v. Connor, 2 Ball & Bea. 154.

 Kelly v. Greenfield, 2 H. & McH. 141.

 1819, ch. 144, s. 4; Canter v. The American & Ocean Insur. Com., 3 Peters, 318.

 Chambers v. Wilkins, 2 Litt. Rep. 146; Huling v. Fort, 2 Litt. Rep. 194.

 Carroll v. Norwood, 4 H. & McH. 290; Mahoney v. Ashton, 4 H & McH. 323; Beekman v. Frost, 18 John. 558.

 Some partial provisions have been made in relation to this matter by the acts of 1825, ch. 117, s. 2; and 1832, ch. 302, s. 5.

 Rawlings v. Stewart. — This was a bill filed by a mortgagor against a mortgagee to redeem; and for an injunction to stay waste. The injunction was granted as prayed. Among the proofs is a deposition of a witness taken on the 10th of January, 1751, before the mayor of London under the act of 5 Geo. 2, c. 7. Upon all which the following decree was passed.
“ And the said cause standing in court ready for hearing, a day was by this court appointed for hearing thereof, on which day, being the first day of June in the year seventeen hundred and eighty, the said cause coming on accordingly to be debated before the Chancellor of Maryland, in the presence of counsel learned on both sides, the substance of the complainant’s bill, the answer of .the defendant, the proofs and exhibits in the cause appearing to be to the effect herein recited and set forth; whereupon, and upon debate of the matter and hearing what could be alleged on both sides, the court doth think fit, and so order and decree; and accordingly it is this first day of June seventeen hundred and eighty, by the honorable Court of Chancery of Maryland, and the power and authority thereof, ordered, adjudged and decreed, that the said Jonathan Rawlings be let in to redeem the land and appurtenances so as aforesaid mortgaged by Aaron Rawlings to William Hunt, and by him conveyed and made over to the said George Stewart, as set forth in the bill of complaint aforesaid, he the said complainant paying and satisfying to the said George Stewart what shall appear to be really bona,fide, and equitably due and owing for principal and interest upon the mortgage aforesaid. And that an account be taken of the principal and interest really, bona fide and equitably due and owing upon the said mortgage, dis *23 tinctly ascertaining in the said account the credits, advancements, and disbursements of the said William Hunt made and given upon the security, and the payments, satisfactions, and remittances made in the lifetime of the said Aaron Rawlings, and since his decease, in discharge of the said mortgage. And the amount of the sales of the negroes, and other personal estate of the said Aaron Rawlings made after his death by the agent of the said William Hunt, and for his use ; also the annual value of the rents and profits of the said mortgaged lands during the time the said lands were in the possession of the said William Hunt, and the annual value of the rents and profits thereof from the time of the defendant’s possession of the said lands to the time of taking the said account; and of the repairs and lasting improvements made thereon by the said defendant; and also the waste and destruction, and the value thereof committed by the said defendant on the said mortgaged lands during the term of his possession aforesaid. — J. Rogers, Chancellor.”
The defendant prayed an appeal from this decree, which was granted accordingly; and he filed an appeal bond in the penally of fifty thousand pounds current money, with two sureties. The bond recites, that It was given in conformity to the act of 1713, ch. 4. The Court of Appeals affirmed the decree. The record then proceeds thus: “ and at October court, 1785, the honorable the Judges of the High Court of Appeals returned to this court the transcript aforesaid with their proceedings on the same, to wit: and now here, &c. to the end of the judgment of the Court of Appeals, &c. Chan. Proc. No. 2, from 1784 to 1786, page 62, 113, and Slye v. Llewellen, ante 18, note.
But this matter has been since otherwise finally settled, Thompson v. McKim, 6 H. & J. 330; 1830, ch. 185, s. 1.

 1785, ch. 72, s. 27; 1819, ch. 144, s. 4; 1826, ch. 200, s. 14.

 Johnson v. Goldsborough, 1 H. & J. 499.

 Wharod v. Smart, 3 Burr. 1823; Thomas v. Goodtille, 4 Burr. 2501.

 Act Cong. 24 Sept. 1789, ch. 20, s. 22.

 Williamson v. Kincaid, 4 Dal. 20; Courze v. Stead, 4 Dal. 22; The United States v. The Brig Union, 4 Cran. 216; Cooke v. Woodrow, 5 Cran. 14; Rush v. Parker, 5 Cran. 287; Green v. Liter, 8 Cran. 229.

 Some provision upon this subject has been since made by the act of 1826, ch. 200.

 Cox v. Bozman. In this case, the bill having-been dismissed with costs, the plaintiff prayed am appeal which was granted; and he thereupon filed an appeal bond, at the foot of which is the following certificate: “ Talbot County, silicit, 31st October, 1785, 1 certify, that the aforegoing appeal bond was executed, by the signing, sealing, and delivery of the same, by the persons thereto signing, in the presence of the subscriber, one of the justices of the peace for the county aforesaid, and in the presence of John Tibbel and John Dougherty the subscribing witnesses, John Bracco.” Chan. Proc. No. 2, page 250.

 1716, ch. 1, s. 3; 1789, ch. 26, s. 15; 1794, ch. 54, s. 8.

 Johnson v. Goldsborough, 1 H. & J. 499.

 1 Ev. Poth. Obl. 390.

 1 Ev. Poth. Obl. 390.

 1715, ch. 46, s. 9; 1742, ch. 10; 1789, ch. 26, s. 15.

 McMullen v. Burris. A decree having been passed appointing a trustee to sell lands to pay debts, he filed his bond accordingly which was endorsed thus. “ Wm. Pinkney is well acquainted with the circumstances of Mr. Thomas, and begs leave to inform the Chancellor, that the within bond is ample security for the performance of his trust.” Upon which it was “ approved A. C. Hanson, Chan. 8th October, 1792.” Similar in Deale v. Stewart, 1794; Coale v. Garretson, 1795, &c. &c.

 Votes & Pro. Ho. Del. 4th February, 1825.

 Some provision has been since made in relation to this matter by 1826, ch. 200, s. 15.